Filed 3/25/13  In re A.L. CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.L., a Person Coming Under the Juvenile Court Law. | H037874 (Santa Clara County Super. Ct. No. JV36795) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>A. L.,<br><br>    Defendant and Appellant. | |

On December 21, 2011, the Santa Clara County District Attorney filed an amended wardship petition under Welfare and Institutions Code section 602, subdivision (a) alleging that A.L. committed attempted murder (Pen. Code, §§ 187, 664, victim Jane Doe., count one),[1] possessed a weapon on school grounds (§ 626.20, subd. (a), count two),[2] carried a dirk or dagger concealed on his person (§ 12020, subd. (a)(4), count three), stalked Jane (§ 646.9, subd. (a), count four), resisted, delayed or obstructed a police officer (§ 148, subd. (a)(1), count five), and attempted to kidnap Jane (§§ 207, subd. (a), 644, count six).  The petition contained allegations that as to the attempted

---

[1]    We refer to the victim in this case as Jane Doe or Jane to protect her anonymity.

[2]    All undesignated section references are to the Penal Code.

murder count, the stalking count and the attempted kidnapping count A.L. was armed with a knife.

Thereafter, following a contested jurisdiction hearing, the juvenile court sustained the 602 petition finding four of the allegations to be true. Specifically, the court found true the allegations of attempted murder while armed, possession of a knife on school grounds, possession of a dirk or dagger, and evading a police officer. The court found not true the stalking and attempted kidnapping allegations.

Subsequently, on January 9, 2012, the court declared A.L a ward of court, and ordered him removed from the custody of his parents. The court placed A.L. in the custody of the California Department of Corrections and Rehabilitation Division of Juvenile Facilities.[3]

A.L. filed a timely notice of appeal.

On appeal, A.L. challenges as insufficient the evidence to support the true finding on the attempted murder charge.

*Standard of Review*

In reviewing the sufficiency of the evidence to support a juvenile adjudication, the standard of review is the same as that applied in reviewing the sufficiency of the evidence to support a criminal conviction. (*In re Sylvester C.* (2006) 137 Cal.App.4th 601, 605.) In either case, "we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Ibid.,* fn. omitted; accord *People v. Bolin* (1998) 18 Cal.4th 297, 331.) We do not reweigh evidence or resolve credibility issues, which are "the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) The testimony of a single witness is sufficient to support a

_____

[3] The court advised A.L. that his maximum term of confinement was 11 years eight months.

2

conviction unless it narrates physically impossible or inherently improbable events. (*Ibid.*) We draw all reasonable inferences in favor of the factfinder's conclusions, whether based on direct or circumstantial evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) Nevertheless, a finding is not supported by substantial evidence if it is based solely on unreasonable inferences, speculation, or conjecture. (*In re H.B.* (2008) 161 Cal.App.4th 115, 120.)

*Testimony Adduced at the Contested Jurisdiction Hearing*

Jane testified that in the fall of 2008 she sat next to A.L. in biology class. Jane tried to be nice to A.L. and would say hello in class. Initially, A.L. was shy, but eventually he began asking her advice about such things as school dances.

Around March 2009, A.L. started sending Jane MySpace messages in which he pressured her to meet him after school. Jane did not feel comfortable spending time with A.L. and so she rejected his requests. Around the same time, A.L. asked to be in Jane's group for a project, which required meeting after school.

Towards the end of the school year, A.L. began following Jane around the school campus trying to get her attention. On one particular day while they were walking to class A.L. told Jane that he had something to tell her; he told her he had an erection. Jane went home and told her mother. Jane thought that it was an odd thing to say and she became concerned for her safety.

At the beginning of the summer, A.L. did not try to contact Jane. However, in July, A.L. sent Jane a MySpace message asking her if she wanted to go with him to the Great America amusement park. Previously, Jane had been too afraid to delete A.L. as a MySpace friend, but after receiving this new message she blocked and deleted his MySpace profile. Soon thereafter, Jane started getting messages from a MySpace user by the name of "Lina," who claimed to be A.L's cousin. Lina sent numerous messages to Jane asking her why she wanted to hurt A.L.; the tone of the messages became increasingly angry.

Eventually, Jane realized that Lina's profile was created and controlled by A.L. Jane told "Lina" on MySpace that if she received another message she would contact the authorities. Jane received a message directly from A.L.'s MySpace account on August 27, 2009. The message told her to relax and that everything would be "okay." This message caused Jane to be concerned for her safety. A.L. tried to add Jane as a friend on Facebook, but Jane blocked his request.

During May and June of 2009, Brian Thompson, Assistant Principal at A.L.'s school, had spoken to A.L about his interactions with Jane. A.L. told him that he was upset that Jane did not want to be his friend, but promised to stop sending messages to Jane. However, in July, A.L. sent an email message to Mr. Thompson to let him know that he still wanted to contact Jane. One week in early September, A.L. went to Mr. Thompson's office and told him that he wanted to talk to Jane; Mr. Thompson told him not to contact her.

Later that same week, Jane went to Mr. Thompson's office with copies of messages that A.L. had sent her. Mr. Thompson arranged a meeting with A.L. and his father to discuss A.L.'s unwanted contact with Jane. A.L. signed a "behavior contract" in which he agreed not to initiate contact with Jane in person or by any other means. A.L. was warned that if he broke the contract, disciplinary action would occur. As a disciplinary measure, A.L. was instructed to attend Saturday school for lying about his contact with Jane over the summer.

Adam Stickles, Assistant Dean of Discipline at A.L.'s school, testified that on September 23, 2009, he met with A.L., Mr. Thompson, and Officer Grogin. A.L. was asked about the messages Jane had been receiving, including those Jane had received from Lina; A.L. admitted he had authored those messages. Mr. Stickles reminded A.L. of the terms of his behavioral contract, but A.L. said that he had trouble following the contract because he had not had "closure" in his previous contacts with Jane. A.L. explained that in turning away his advances, Jane was "frustrating him."

4

According to Jane in early 2010, on her birthday, she received a message on Facebook from someone named "Tanya." The message said something similar to " 'Be careful with those who love you.' " Jane concluded the message came from A.L. because it was consistent with the type of messages that A.L. had sent to her before.

The day Jane received the message from "Tanya," Jane filed a formal complaint about A.L.'s behavior. Jane told Mr. Thompson that A.L. was stalking her; he would follow her to the classroom where she had her fifth period class and wait for her on a bench near where she had her sixth period class. Jane said that she did not feel safe, was "having anxiety" and was having trouble sleeping; she thought that A.L. was going to harm her. As a result of the breach of his behavior contract and his refusal to leave Jane alone, A.L. was transferred to another school.

Subsequently, A.L. wrote angry posts on his Facebook page. In these posts he said that he blamed Jane for getting him "kicked out" of his favorite school and for taking away his friends, his happiness, his education, his motivation and for ruining his reputation and life. In one post, A.L. wrote, " 'I didn't want to move on, but I tried. I know what's wrong with me and it's because you lied. I suffered from it for a long time. Very convinced to commit a crime. I'd like to leave now and just be free. I won't go unless you leave with me.' "

A.L. created a group posting on his Facebook page, which he entitled " 'When 230 people joined, [A.L.] will express his real feelings for her.' " A.L. wrote on the group posting, " 'Would give anything to shed tears of joy while in your arms. We both want the suffering to end. Let us end it.' "

On February 11, 2010, shortly before 12:15 p.m., Susan Walker, the Principal at Jane's school, received information that A.L. was on campus near "Mustang Lane," the main thoroughfare onto the school campus. Ms. Walker found A.L. wearing aviator

5

glasses, even though it was not a sunny day, and a leather jacket.[4] Ms. Walker reminded A.L. that he was no longer a student at the school, to which A.L. responded that he had never agreed to attend another school.

As A.L. would not move, Ms. Walker called for the police to escort A.L. to the school office so that he could be taken home by his parents before Jane saw him. After Ms. Walker called the police, A.L. agreed to go with her to the office. However, A.L. began to head down Mustang Lane toward the front of the school campus. Officer Victor Rodriguez and Officer Stevens arrived and attempted to escort A.L. to the campus security office. A.L. refused to make eye contact with them and had a "blank stare." Officer Rodriguez tried to pat search A.L. but A.L. "tried to take off running" northbound on Mustang Lane toward Blossom Hill.

Jane testified that as she approached her fifth period class she saw A.L. dressed in a trench coat with police officers surrounding him. Jane became very concerned as she knew something was going to happen. When she saw A.L., their eyes "lock[ed]" and A.L. ran around the officers and toward her; she thought he was coming after her. A.L. came within 20 or 30 feet of her. While attempting to run, A.L. dropped a school map that bore markings that were near the classrooms by Mustang Lane and the girl's locker room. According to Jane, as A.L started to run towards her, Ms. Walker told her to go to the office.

Officer Stevens grabbed A.L. as he started to run and a struggle ensued; Officer Rodriguez saw A.L. attempt to reach under his trench coat for something with his right arm, but was prevented from so doing by the officers. Although A.L. was trying to resist, Officer Rodriguez grabbed A.L.'s arm and placed him in handcuffs. During a pat search of A.L., Officer Rodriguez located something solid in the interior left hand side of A.L.'s trench coat that aroused his suspicions. Accordingly, Officer Rodriguez went into the

---

[4]     The leather jacket was described by the court as a "trench coat."

interior left hand side of the trench coat and removed a green towel inside of which was a 12-inch serrated butcher-type knife; the blade was approximately seven and a half inches.

The officers found what appeared to Officer Rodriguez to be a suicide note; the note read " 'Dearest Cassandra, you've been such a wonderful friend to me. I would never did [*sic*] what I did to [Jane]. Although you've been a great motivation to me, I cannot love you the way I loved [Jane]. I still love you, of course, as a friend, as a cousin, as a sister. You've been there for me. Supporting me. One of the nicest and caring girls I've ever [m]et.' " The letter concluded, " 'By the time you actually read this letter, I'm already dead, Cassandra. . . . Be careful with the people that you love. [Jane] wasn't careful with me. But we'll be together now. Just her and I. In a happy place. I promise I'll take care of her. And I'll do my best to protect you with whatever power I earn.' "

Officer Rodriguez found two more letters that were addressed to Jane. In one note, A.L. told Jane that she had prevented his third suicide attempt, but then abandoned him. He said that he "suffered the pain" she had inflicted on him by her "careless and selfish actions" and "ignorance." A.L. wrote that he would "rather not have revenge," but Jane had made "no efforts in finding a solution in restoring" their relationship. A.L. said that he had "been suffering all this time" and if "this keeps going" he would not "be ready for what's to come in the future." In a second note, again, A.L. blamed Jane for abandoning him. He said that he was "not going to live with this." He blamed Jane for ruining his life and told her that she "should have thought about" her "actions before committing them." A.L concluded that he both loved and hated Jane, and " 'would face any horror and overcome [his] darkest fears just to hear [her] voice before [he went] to sleep.' "

A.L. was in handcuffs when the officers escorted him to the campus security office. After Officer Rodriguez gave A.L. *Miranda* advisements,[5] A.L. said he did not want to say anything unless Ms. Walker was present. After Ms. Walker arrived, A.L. told the officers that he came to the school that day to kill Jane; he had planned the killing in his head numerous times. He said that he regretted not stabbing and killing Ms. Walker when she first approached him and he was planning on killing the officers to get to Jane. A.L. said he was not concerned about having to fight them. A.L. said that he arrived on campus early so he could kill Jane "in front of everybody." After he killed Jane he was going to kill himself. While giving his statement, A.L. expressed no remorse and remained focused and coherent.

Dr. Leonard Donk, a forensic psychologist, testified for the defense that A.L. had an erotomanic type delusional disorder. A person with this type of disorder mistakenly believes someone is in love with them. The delusion can become so powerful that the afflicted person "cannot stop thinking about them." However, the afflicted person becomes a "wounded narcissist," who cannot understand why the object of their affection will not do things for them. According to Dr. Donk, A.L.'s delusion possibly overrode his conscience and caused him to blame his problems on Jane. Dr. Donk diagnosed A.L. as also having obsessive compulsive disorder.

Dr. Donk concluded that A.L. had a linear plan; it was not a sophisticated plan, but he had "clearly done some thinking." However, he did not plan anything other than a series of steps and as soon as that series of steps was interrupted whatever the plan was, it dissolved.

*Discussion*

As noted, A.L. challenges as insufficient the evidence to support the true finding on the attempted murder conviction. Specifically, A.L. argues that a careful review of his

---

5      *Miranda v. Arizona* (1966) 384 U.S. 436.

8

written and oral statements together with all reasonable inferences that can be drawn from the circumstances of the offense, establish that he did not have the required intent to kill at the time of his arrest.  Further, the evidence was insufficient to conclude that he took a direct step toward killing Jane.

Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.  (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 7 (*Decker*); § 21a.)  "Preparation alone is not enough, there must be some appreciable fragment of the crime committed, it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter, and the act must not be equivocal in nature."  (*People v. Buffum* (1953) 40 Cal.2d 709, 718, overruled on another ground by *People v. Morante* (1999) 20 Cal.4th 403, 422.)

To put it another way, " ' "To constitute murder, the guilty person need not intend to take life; but to constitute an attempt to murder, he must so intend."  [Citation.]  "The wrong-doer must specifically contemplate taking life; and though his act is such as, were it successful, would be murder, if in truth he does not mean to kill, he does not become guilty of an attempt to commit murder."  [Citation.]'  [Citations.]"  (*People v. Bland* (2002) 28 Cal.4th 313, 327-328.)  "There is rarely direct evidence of a defendant's intent.  Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.  [Citation.]"  (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.)  "One who intentionally attempts to kill another does not often declare his state of mind either before, at, or after the moment he [acts].  Absent such direct evidence, the intent obviously must be derived from all the circumstances of the attempt, including the putative killer's actions and words.  Whether a defendant possessed the requisite intent to kill is, of course a question for the trier of fact.  While reasonable minds may differ on the resolution of that issue, our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  [Citations.]"

9

(*People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946 (*Lashley*).) "Our role is to determine the legal sufficiency of the found facts and not to second guess the reasoning or wisdom of the fact finder." (*Id.* at p. 946.) "[I]t has long been conclusively established in this state, beyond the need for citation of authority, that a person to be guilty of the crime of attempt to commit murder must harbor the *specific* intent to kill at the time of the overt act by which the attempt is manifested." (*People v. Santascoy* (1984) 153 Cal.App.3d 909, 913.)

In finding the attempted murder charge to be true the court made the following findings: "[T]here are relatively few disputed facts of any significance in this case. The only one I think is really the timing and characteristics of what was either [A.L.]'s intended flight from the police and/or his last gasp attempt to reach [Jane]. [¶] The only real dispute is what was going on in the mind of [A.L.] on February 11th, 2010, and that is always a difficult thing to determine, particularly beyond a reasonable doubt nearly two years later. [¶] For what it's worth, we all agree, and I find [A.L.] was romantically focused on [Jane] to the extent any layperson would call an obsession. [¶] There is no evidence that [Jane] ever encouraged a relationship. Great deal of evidence that she did everything possible to free herself from his unwanted attentions and obsessive behaviors. And the evidence proves that [A.L.] was aware of and deeply hurt by his inability to establish a relationship with [Jane]. [¶] He thereafter armed himself, wrote the notes that were found on his person. I think the only reasonable interpretation of which suggests some combination of suicide and homicide. And he trespassed on a crowded campus when he was sure of exactly where the victim would be and was very close to that location when detected. [¶] As a matter of law, I believe that the intent present in his mind at that moment before the authorities intervened is the sole disputed issue in this case. We agree that in order to find the defendant guilty of Count 1, at least, the People must prove beyond a reasonable doubt that he had an intent to kill. [¶] Recapping, the armed mentally troubled youth was trespassing and had come to a location within yards

10

of where he knew the victim would be. He had notes indicating that he hated the victim for not responding to him but he also did indicate that he loved her as well. And the noted indicated -- a note indicating that he would be dead by the time the reader read the note. And he had absolutely no reason to think that the victim would respond to him any differently than she had in any other time. [¶] I think the only reasonable inference supported by the facts and others is that [A.L.] specifically intended to kill the victim. There's little evidence or no ambiguity in the Court's view, but even if there had been ambiguity, that would have been eliminated by [A.L.]'s post-Miranda statements to the police and school officials when he said unambiguously that his intent was to kill the victim."

A.L. argues that the uncontroverted testimony of both people who were present when he made his statements was not that he arrived at the school intending to kill Jane, but that he went to the school intending to win her back, and only if certain conditional events failed to materialize would he kill her and then himself. A.L. points out that the following testimony supports this claim.

"[Prosecutor]: During the course of this conversation [the security office interrogation], did he say that he had come to campus with the intent to kill [Jane]?

"[School Principal]: Yes, that he was going to give her one more chance, apparently. He had a plan that -- again, I don't remember exactly. But my understanding was that he was going to have one of her friends drive them somewhere and give her one last chance. If she didn't decide to like him, that he was going to kill her."

Later when asked by the prosecutor if she remembered A.L. saying that he was going to kill Jane with a knife, the principal replied "Yes." The prosecutor went on to ask "And that was if she did not comply with anything that he asked to?" The principal replied, "Right. If the friend didn't come and she wouldn't go."

Similarly, Officer Rodriguez testified to what A.L. told him. Specifically, he testified that A.L. told him "he came to [the school] to kill [Jane]." When asked by the

11

prosecutor what the officer was told as to what A.L. was going to do on campus, the officer replied, "He said he was going to find [Jane], take her hostage, have her read the note, and if she didn't comply with the note, then he was going to kill her."

A.L. argues that he had a linear, sequential plan. Based on the foregoing evidence he asserts that "no inference can be made -- without resorting to conjecture and guesswork -- as to what might have happened had [he] actually approached [Jane] and set the various predicate steps into motion." He asserts that his statements, "both written and verbal must be viewed through the lens of his mental illness, where grandiosity and false reality are classic traits." He argues that his mental illness necessarily injects uncertainty and ambiguity into all his statements. In addition, A.L. asserts that the juvenile court's conclusion that his arrival on campus with a knife at the time and location where Jane would emerge from class lent itself to only one reasonable interpretation -- namely, that he intended a combination homicide and suicide was based on the assumption that Jane would not respond to his pleas to come back to him because she had not done so in the past. However, he argues that a finding of attempted murder cannot rest on what Jane might or might not do, but on the court's determination of what he intended to do at the time when he was apprehended. The only intent reasonably supported by the evidence, A.L. argues, is his intent to persuade Jane to come back to him.

Were A.L.'s statements to the officers after he was arrested as outlined *ante* the only evidence of A.L's intent on the day in question, we might have agreed with A.L. However, A.L. made other statement's both written and oral and did things from which a reasonable trier of fact could conclude that A.L. went to the school with the intent to kill Jane and that it was not conditional on Jane's reaction to his requests.

Absent direct evidence of intent, obviously, we must derive A.L.'s intent from all the circumstances of the attempt, including A.L.'s actions and words. (*Lashley*, *supra*, 1 Cal.App.4th at pp. 945-946.) Perhaps the most damning piece of evidence on this point was A.L's action when Jane arrived on the scene. That is, he attempted to run toward her

12

at the same time as he attempted to reach under his trench coat with his right hand, where it was later discovered he had concealed a knife. A.L.'s letters to Cassandra and Jane strongly implied that his plan was to kill Jane and then himself and that his actions were not contingent on anything that Jane did or did not do. The court was free to reject, as it necessarily did in finding the attempted kidnapping charge to be not true, A.L.'s self-serving statements to the officers that he was going to give Jane one chance to go with him and if she did not only then would he kill her.

Furthermore, the notes that A.L. wrote and A.L.'s Facebook postings indicated that A.L. blamed Jane for his unhappiness and ruining his life. Thus, the notes and A.L.'s Facebook postings strongly suggested a motive for A.L. to kill Jane. Although evidence of motive is not required to establish intent to kill, evidence of motive is often probative on the issue. (*People v. Smith* (2005) 37 Cal.4th 733, 740 [where motive is shown, such evidence will usually be probative of proof of intent to kill.].)

While reasonable minds may differ on the resolution of the issue of A.L.'s intent when he went to the school to see Jane, our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; see also *People v. Johnson* (1980) 26 Cal.3d 557, 575-578.) We reiterate, "[d]ue process of law does not require a reviewing court to reweigh evidence or redetermine witness credibility. In fact, it would distort the process if this court, reading a 'cold' record, substituted its judgment for that of the trier of fact who saw and heard the live witnesses. Our role is to determine the legal sufficiency of the found facts and not to second guess the reasoning or wisdom of the fact finder." (*Lashley*, *supra*, 1 Cal.App.4th at p. 946.)

Here, the juvenile court, sitting as the trier of fact, had sufficient evidence before the court from which it could find that A.L., having publicly expressed his animosity to Jane in his Facebook postings and in his letters, had the specific intent to kill Jane when he went to the school armed with a knife and suicide/homicide notes.

Finally, A.L. argues that the evidence was insufficient to conclude that he took a direct step toward killing Jane.

As noted, attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. (§ 21a; *People v. Lee* (2003) 31 Cal.4th 613, 623.)[6] "For an attempt, the overt act must go beyond mere preparation and show that the killer is putting his or her plan into action; it need not be the last proximate or ultimate step toward commission of the crime or crimes [citation], nor need it satisfy any element of the crime. [Citation.]" (*Decker, supra,* 41 Cal.4th at p. 8.) However, as our Supreme Court has explained, " '[b]etween preparation for the attempt and the attempt itself, there is a wide difference. The preparation consists in devising or arranging the means or measures necessary for the commission of the offense; the attempt is the direct movement toward the commission after the preparations are made.' [Citations.] ' "[I]t is sufficient if it is the first or some subsequent act directed towards that end after the preparations are made." ' [Citation.]" (*Ibid*.) It has long been recognized that " '[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.' [Citations.]" (*Ibid*.)

Viewing the entirety of A.L.'s conduct in light of his unequivocal intent, we find sufficient evidence under the slight-acts rule for the juvenile court to have found true the attempted murder charge. A.L. armed himself with a knife and a map of the school grounds marked with classroom locations; he proceeded to the school at a time when he thought Jane would be on campus. Had A.L.'s plan not been interrupted by Ms. Walker we have no doubt given his animosity toward Jane, the fact he was armed with a knife and suicide/homicide notes that he would have carried out his plan to kill Jane and then himself so they could "be together . . . ." Even if we were to conclude that all of A.L.'s conduct up until the time when he was stopped by Ms. Walker was mere preparation,

---

[6] A direct but ineffectual act is frequently referred to as an overt act in the case law. (See, e.g., *People v. Luna* (2009) 170 Cal.App.4th 535, 540.)

14

A.L.'s conduct when Jane arrived on the scene would alone satisfy the test for an overt act.[7]

A.L. argues that the evidence failed to establish an " 'appreciable fragment of the crime' " of murder. He argues that he never approached Jane,[8] never removed the knife, never delivered the letters, nor did he make an overt threat.

Our Supreme Court has explained the "reference [in *People v. Buffum*, *supra*, 40 Cal.2d 709, 718] to an 'appreciable fragment of the crime' is simply a restatement of the requirement of an overt act directed towards immediate consummation; it does not establish the novel requirement that an actual element of the offense be proved in every case." (*People v. Dillon* (1983) 34 Cal.3d 441, 454 (*Dillon*).)

The fact that A.L. was never within striking distance of Jane, did not actually remove the knife, make an overt threat or deliver his letters is of no moment. As the *Dillon* court observed long ago, "It is obviously impossible to be certain that a person will not lose his resolve to commit the crime until he completes the last act necessary for its accomplishment. But the law of attempts would be largely without function if it could not be invoked until the trigger was pulled, the blow struck, or the money seized. If it is not clear from a suspect's acts what he intends to do, an observer cannot reasonably conclude that a crime will be committed; but when the acts are such that any rational person would believe a crime is about to be consummated absent an intervening force,

---

[7]     We reject A.L.'s argument raised in his reply brief that because the court found the resisting arrest allegation to be true, the court must necessarily have rejected Jane's testimony that A.L. ran toward her. A.L.'s act of starting to run toward Jane and then his act of resisting the officers as he so did does not as A.L. asserts conclusively show that the court concluded that when he darted he was fleeing from the police, not charging toward Jane; he could have been doing both. As he started to run toward Jane he was resisting or delaying the officers taking him to the school office.

[8]     A.L. misconstrues the evidence on this point. Jane testified that when she arrived on the scene, A.L. ran around the officers and toward her.

15

the attempt is underway, and a last-minute change of heart by the perpetrator should not be permitted to exonerate him." (*Dillon*, *supra*, 34 Cal.3d at p. 455.)

" 'One of the purposes of the criminal law is to protect society from those who intend to injure it. When it is established that the defendant intended to commit a specific crime and that in carrying out this intention he committed an act that caused harm *or sufficient danger of harm*, it is immaterial that for some collateral reason he could not complete the intended crime.' [Citation.]" (*Dillon*, *supra*, at p. 453, italics added.)

Accordingly, given the evidence as outlined *ante*, we reject A.L.'s contention that there was insufficient evidence that he took a direct step towards killing Jane.

## *Disposition*

The juvenile court's jurisdiction and disposition orders are affirmed.

_____

ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

PREMO, J.

16