Filed 6/24/15  P. v. Silva CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>FREDDY SILVA,<br><br>        Defendant and Appellant. | B253711<br><br>(Los Angeles County<br> Super. Ct. No. KA097091) |

APPEAL from the judgment of the Superior Court of Los Angeles County.  Mike Camacho, Judge.  Affirmed.

Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Mercer and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant Freddy Silva was convicted by jury of four counts of attempted murder of a peace officer, two counts of carjacking, and multiple other felonies arising from defendant having led police on a high speed pursuit through the cities of West Covina and Pomona. He contends the four attempted murder counts, the special allegations the attempted murders were committed with premeditation, and two of the counts for assault on a peace officer with a firearm fail for lack of sufficient evidence. Defendant also argues the trial court committed instructional and evidentiary error.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We summarize the facts material to the issues presented on appeal. Some of the trial testimony and evidence has not been summarized because it is not germane to the issues raised on appeal.

On February 25, 2012, shortly before 6:00 a.m., Miguel Valle got into his red Ford Expedition to head to work. Just as Mr. Valle started the engine, a man (who the victim later identified from a six-pack as defendant), knocked on his driver's side window with the barrel of a shotgun and told him to shut off the engine. Mr. Valle said no, and defendant "racked" or cocked the pump action shotgun. That scared Mr. Valle, so he got out of the car. Defendant hit him in the forehead, just above his left eye, with the gun. Defendant told Mr. Valle not to look at him. Defendant and his accomplice then drove off in Mr. Valle's car.

The next day, Matt Nelson, an officer with the West Covina Police Department, was on patrol at around 3:00 p.m. when he noticed a red Ford Expedition in traffic. He saw that the front license plate was dangling, so he ran an inquiry for any violations and determined the car had been reported stolen during a carjacking the day before.

Officer Nelson activated the lights on his patrol car and prepared to detain the Expedition as it pulled into a parking lot, but as soon as he activated his lights, the Expedition sped out of the lot and drove over the raised center median to make a U-turn. Officer Nelson turned on his sirens and started towards the median, intending to drive over it to pursue the Expedition. As Officer Nelson crossed over the median, he saw

2

defendant point a shotgun out the driver's side window directly at him. The cars were about 15 to 20 yards apart. Defendant then sped off, swerving through vehicle and pedestrian traffic, and intermittently brandishing the shotgun out the driver's side window of the Expedition. Officer Nelson continued in pursuit.

After running several red lights at high speeds, defendant slowed the car, and came almost to a stop. Defendant pointed the shotgun out the driver's side window toward the rear, directly at Officer Nelson's patrol car. Officer Nelson saw a muzzle flash, heard a shot, and felt the concussion of a round traveling near or over his head. He saw defendant bring the shotgun back inside the car and "chamber" another round. Defendant slowly drove the Expedition forward, continuing to fire back at Officer Nelson for a few more seconds.

Defendant then took off again at a high rate of speed. Justin Schienle, another officer with the West Covina Police Department, heard the radio traffic about the pursuit and caught up to the location. As he joined the pursuit near the intersection of Amar and Meadow Pass roads, Officer Schienle saw defendant point a shotgun at him out the driver's side window as he drove by. Officer Schienle saw a muzzle flash in his direction. Still driving behind defendant, Officer Nelson thought he heard a shot being fired, but was not certain. Defendant then started to turn right but quickly made a "full 360-degree turn" pulling in behind Officer Nelson and in front of Officer Schienle.

Officer Nelson made an abrupt U-turn over the center median, and then another, and pulled in behind defendant's car once again. Defendant raced through another red light, and Officer Nelson slowed to avoid a collision with cross-traffic. He had to speed up to 100 miles per hour to catch up with defendant.

Another West Covina Police officer, Bryan Chalais, heard the radio traffic regarding the pursuit, including that the suspect was brandishing and firing a shotgun at pursuing officers. Officer Chalais joined the pursuit somewhere along Amar Avenue. Officer Chalais pulled in as the third patrol car behind Officer Schienle. They were travelling between 70 and 90 miles per hour. All officers had their lights and sirens activated.

3

As they approached the Cal Poly Pomona campus, defendant slowed once again, and again pointed the shotgun out the driver's side window at Officer Nelson. Defendant then sped off again, going the wrong way up an exit ramp of the 10 Freeway, forcing numerous vehicles heading down the ramp to take "evasive" actions to avoid being hit by defendant. At that point, both Officer Nelson and Officer Schienle lost sight of defendant.

However, Officer Chalais was able to get on the 10 Freeway, on the correct side, and parallel defendant's movements on the freeway. Officer Chalais briefly lost sight of defendant after exiting the freeway, but found him again in a residential area with speed bumps. They were travelling so fast that Officer Chalais was getting "airborne" over the speed bumps so he slowed down a bit to avoid losing control of his vehicle. He again briefly lost sight of defendant.

At about this same time, James Suess, an officer with the Pomona Police Department, joined the pursuit. He had driven to the area in response to a dispatch call that West Covina officers were involved in a pursuit of a red Expedition that had entered the city of Pomona and the driver was shooting from the vehicle.

Muhamet Vinca was in his white Honda Civic, waiting at the intersection of McKinley and Park Avenue in the city of Pomona. He saw the red Expedition "blow" right through the intersection, hit the curb and crash into a house. Defendant jumped out of the car and ran directly at Mr. Vinca pointing the shotgun. Mr. Vinca was frightened and got out of his car. Defendant got in and drove off.

At that point, Officer Chalais entered the intersection. He saw the red Expedition crashed into the side of a house. Almost immediately, a white Honda drove directly at him and rammed the front of his vehicle. Officer Chalais believed it was defendant in the car and broadcast that information on the radio.

Officer Suess arrived at the intersection and saw Officer Chalais's vehicle get rammed by the white Honda, and Officer Chalais get out with his shotgun. The white car pulled away and sped off. Officer Chalais returned to his car and pursued the white

4

Honda, with Officer Suess following. Officer Suess advised his Pomona dispatcher they were now in pursuit of a white Honda.

After a brief chase at high speeds, the white Honda abruptly slowed down, causing the tires to smoke and screech. Defendant, pointing the shotgun, got out of the car before it came to a complete stop, and walked toward the arriving patrol cars. Officer Chalais stopped his car, got out with his shotgun and took a position in the street behind his open door. Other officers, including Officer Suess, took cover behind their vehicles. Officer Suess and Officer Chalais were closest to defendant, forming a sort of "triangle" with him in relation to where he was standing. Several officers were yelling at defendant to drop his gun and get down on the ground. Defendant ignored those commands. Officer Suess saw defendant pointing the shotgun and turning in his direction, so he got down to avoid being shot.

Officer Chalais saw defendant make a "back and forth" motion with his shotgun as if panning for a target. Defendant held the shotgun about chest-high like he was ready to shoot. Defendant then started to turn toward Officer Chalais. They were only about 20 yards apart. Officer Chalais believed defendant was going to shoot him, so he fired his weapon and shot defendant in the upper left shoulder. Defendant dropped his weapon, and fell to the ground.

Defendant was taken into custody, and patted down for additional weapons. First aid was rendered until the paramedics arrived and defendant was transported to the hospital. Defendant's shotgun, which had a live round in the chamber, was recovered from his possession and secured as evidence.

At the separate crime scene where defendant had crashed the red Expedition, Adriana Frausto and her husband, the owners of the home into which defendant crashed, found defendant's five-year-old son seated in the back of the car. The boy was crying and repeatedly saying "my father is dead." Officers recovered the following items from inside the Expedition: three expended 12-gauge shotgun shells, one live shotgun shell, a .25-caliber Beretta handgun with a live round in the chamber and four in the magazine, a

5

cell phone, a box of .25-caliber ammunition, a pistol loader, a child's car seat, and mail addressed to defendant.

Officer Nelson did not fire any shots during the high speed pursuit of defendant. He was concerned about using deadly force at high speeds, for the safety of other members of the public and for the second person he saw in the back of defendant's car, who he believed could be a hostage. Officer Nelson's pursuit of defendant was "pretty fluid," events happened very rapidly, one after another, with the overall pursuit taking no more than six to seven minutes. Neither Officer Nelson, nor Officer Schienle was hit by any of the shots fired by defendant.

Defendant was charged by amended information with fourteen counts: four counts of attempted premeditated murder of a peace officer (Pen. Code, §§ 187, subd. (a), 664; counts 1, 2, 13 & 14); four counts of assault with a firearm on a peace officer (Pen. Code, § 245, subd. (d)(1); counts 3, 4, 5 & 6); two counts of carjacking (Pen. Code, § 215; counts 7 & 11); one count of evading a peace officer (Veh. Code, § 2800.2, subd. (a); count 8); one count of child endangerment (Pen. Code, § 273a, subd. (a); count 9); one count of possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); count 10); and one count of assault on a peace officer (Pen. Code, § 245, subd. (c); count 12).

Multiple firearm allegations were also specially pled: (1) as to counts 1 through 4, defendant personally discharged a firearm in the commission of the offenses (Pen. Code, § 12022.53, subd. (c)); (2) as to counts 1 through 7, 11, 13 and 14, defendant personally used a firearm in the commission of the offenses (§ 12022.53, subd. (b)); and (3) as to counts 1 through 7, 9, 11, 13 and 14, defendant personally used a shotgun in the commission of the offenses (§ 12022.5, subd. (a)). As to all counts, it was also specially alleged defendant suffered three prior felony convictions for which he served prison terms (§ 667.5, subd. (b)).

Defendant pled not guilty to all charges and denied the special allegations.

The case proceeded to trial by jury. During voir dire, defendant agreed to plead guilty to being a felon in possession of a firearm (count 10). The parties stipulated to

renumbering the remaining counts (original counts 11, 12, 13 and 14 were renumbered, respectively as counts 10, 11, 12, and 13).[1] Trial of the prior convictions was bifurcated and defendant waived his right to a jury trial on those allegations.

The prosecution presented the evidence described above. The audiotape of Officer Nelson's radio transmissions during the pursuit were played for the jury, as was the videotape from Officer Suess's dashboard camera showing the end of the pursuit where defendant got out of the white Honda, pointing his shotgun at the officers, and was eventually shot. Ivan Chavez, a deputy and firearms examiner with the Los Angeles County Sheriff's Department, testified that a shotgun of the type used by defendant would be lethal if fired at a person from a distance of 20 to 30 yards.

Defendant did not testify in his own defense, but offered the testimony of several witnesses. Gerardo Villa testified he saw the crash between the white Honda and Officer Chalais's patrol car and he believed the patrol car rammed the Honda and not the other way around. Katherine Pavon, defendant's girlfriend, testified she saw defendant approximately a month after the incident and described his wounds as primarily to his upper back, shoulder and side of his neck. John Treuting, a toxicologist, provided expert testimony about the addictive qualities of methamphetamine, the effects of the drug on the body, defendant's positive test results for methamphetamine upon arrival at the hospital for treatment for his injuries, and his opinion that, at the time of the chase, defendant was under the influence of methamphetamines.

The prosecution offered, in rebuttal, the testimony of Deputy Troy Ewing, who assisted with the investigation of the incident. He attested to interviewing Gerardo Villa at the scene and that Mr. Villa said the police car hit the white Honda, but he also reported that he saw a Hispanic male with a shotgun walk up to the Honda, point the shotgun at the driver, force him to get out, and then drive off in the car.

---

[1] We refer to the counts by their original numbers to be consistent with the parties.

Officer Tomas Ramirez was recalled to attest to photographs taken of defendant's injuries at the scene before defendant was transported to the hospital.

The prosecution also requested the introduction of exhibit P69 as a business record. Exhibit P69 is a one-page document from defendant's medical records consisting of a small diagram/drawings of an anterior and posterior human form marked to show the location of defendant's injuries. There are a cluster of X's along the upper front left arm, shoulder and neck area, along with a notation of "4 posterior w/hematoma." In the section marked "brief history" it includes the following handwritten language: "Pt was shot in the neck/shoulder by LAPD [with] shotgun while attempting to escape a car impound in stolen vehicle. Pt was shooting at police." The document, which is a preprinted form, also has various boxes checked off regarding defendant's then-medical condition upon admission to the hospital following the incident.

Defense counsel objected to exhibit P69 in its entirety, stating his concern was "foundation. I don't think it's allowed in under the business record [exception]. . . . There's no custodian, qualified witness, to authenticate." The court ruled it was self-authenticating because it had been obtained via a subpoena duces tecum, bearing an appropriate affidavit from the custodian of records, and also that it was a simple document that did not require "some type" of expert witness to explain the contents to the jury.

After further discussion, defense counsel responded: "I understand what the court has deemed self-authenticating with an affidavit subpoena, but I still believe, even with that, it's a violation of my client's rights, confrontation clause, etc." The court ruled exhibit P69 would be admitted over defense objection. The exhibit was displayed to the jury on the video screen without any accompanying witness testimony.

The jury found defendant guilty of all 13 charges and found true all the special allegations. The court sentenced defendant to an aggregate state prison term of 151 years eight months consisting of an indeterminate term of 123 years to life, and a determinate term of 28 years eight months.

This appeal followed.  On August 14, 2014, this court granted defendant's request to augment the record with a copy of prosecution exhibit P69.

## DISCUSSION

### 1.    Insufficient Evidence Claims

Defendant contends the four attempted murder counts, two counts of assault on a peace officer, and the premeditation allegations related to the murder counts all fail for lack of substantial evidence.  We are not persuaded.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*Ibid*.)  "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; accord, *People v. Manriquez* (2005) 37 Cal.4th 547, 577 (*Manriquez*).)

There were four attempted murder counts:  Officer Nelson was the victim in count 1, Officer Schienle was the victim in count 2, Officer Suess was the victim in count 13, and Officer Chalais was the victim in count 14.  The jury found all four counts were committed willfully and with premeditation.  Defendant contends the evidence does not show he harbored the specific intent to kill any of the four officers.  He points largely to the fact none of the officers targeted were actually hit by defendant or injured in any way.  He further argues there was no direct evidence of defendant's intent, and that the circumstantial evidence supported more than one reasonable conclusion about defendant's true intent, including that he had no intent to kill, but only intended to fire at the officers' cars to disable them and aid his attempt to flee.

"[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the

9

defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions." (*People v. Smith* (2005) 37 Cal.4th 733, 741 (*Smith*).) As defendant concedes, the court did instruct with CALCRIM No. 225 regarding the jury's consideration of circumstantial evidence on the issue of mental state.[2]

As to Officers Nelson and Schienle, the evidence showed defendant brandished the shotgun at them multiple times during a high-speed and dangerous pursuit. It further showed that during that chase, defendant intentionally slowed down the car almost to a stop, pointed the loaded shotgun directly at each of them, and fired at them from a distance at which a shotgun may be lethal. As to Officer Nelson, this occurred more than once. Both officers attested to seeing the muzzle flash, and Officer Nelson felt the concussion of the rounds passing by him.

As to Officers Suess and Chalais, the evidence established defendant made the decision to abruptly end the pursuit, braking so hard as to cause the tires to squeal and smoke. He exited the car before it even came to a complete stop, shotgun in hand. The shotgun had a chambered live round and defendant held it up, in a ready-to-shoot position. Officer Suess described defendant's actions as no longer seeking to escape and evade, but moving to "advance" toward the officers who had been pursuing him. Officer Chalais testified defendant moved the shotgun back and forth, chest-high, panning for a

---

**2**     The instruction read, in relevant part: "[B]efore you may rely on circumstantial evidence to conclude that the defendant had the required intent and mental state, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent and mental state. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent and mental state and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent and mental state was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

10

target. Officer Suess and Officer Chalais were the closest officers to defendant, forming a sort of triangle with him, and Officer Chalais was only 20 to 30 yards from defendant, within a lethal shooting range. Both Officer Suess and Officer Chalais described seeing defendant turn in their respective directions pointing the gun. Before defendant was able to turn fully in Officer Chalais's direction, Officer Chalais fired at defendant, ending the confrontation.

Looking at the totality of the circumstances and specifically at defendant's actions, the record contains ample evidence of intent to kill all four officers. (*Smith*, *supra*, 37 Cal.4th at p. 741.) Simply because defendant, who was firing from a moving vehicle, missed two of his intended targets (Officers Nelson and Schienle) does not mean the record lacks the requisite evidence of intent to kill. (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945 (*Lashley*) [finding that evidence of firing "toward the victim at a range and in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill"]; see also *People v. Perez* (2010) 50 Cal.4th 222, 230 [firing of a single bullet at group of eight persons sufficient to support a finding of intent to kill].)

Similarly, Officer Chalais's actions at the end of the pursuit, thwarting defendant's ability to fire on him or Officer Suess, does not compel the conclusion defendant lacked the requisite intent to kill. (*Lashley*, *supra*, 1 Cal.App.4th at pp. 945-946 [rejecting the defendant's "untenable theory that an unsuccessful" attempt at murder "constitutes conclusive evidence of lack of intent"]; see also *People v. Avila* (2009) 46 Cal.4th 680, 702 [the degree of resulting injury to the victim is "is not dispositive" of the defendant's intent; "a defendant may properly be convicted of attempted murder when no injury results"].)

Furthermore, we reject defendant's suggestion we should conclude, contrary to the jury, that the circumstantial evidence supports the conclusion that defendant intended to shoot at the officers' cars but not to kill them, and therefore the attempted murder counts must be reversed. "Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact. While reasonable minds may differ on the

11

resolution of that issue, our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citations.] Due process of law does not require a reviewing court to reweigh evidence or redetermine witness credibility. In fact, it would distort the process if this court, reading a 'cold' record, substituted its judgment for that of the trier of fact who saw and heard the live witnesses. Our role is to determine the legal sufficiency of the found facts and not to second guess the reasoning or wisdom of the fact finder." (*Lashley*, *supra*, 1 Cal.App.4th at p. 946.) In any event, our view of the record is that the only reasonable conclusion from the evidence was that defendant intended to kill all four officers.

The same evidence discussed above constitutes substantial evidence of premeditation supporting the jury's true findings as to all four counts of attempted murder. (*Manriquez*, *supra*, 37 Cal.4th at p. 577 [" '[t]he process of premeditation and deliberation does not require any extended period of time' "]; accord, *People v. Mendoza* (2011) 52 Cal.4th 1056, 1069, and *People v. Brito* (1991) 232 Cal.App.3d 316, 323-324 [fact that the defendant made decision, within a matter of a few seconds, to shoot fleeing victim in back did not defeat finding of deliberation].)

With respect to counts 13 and 14 pertaining to Officers Suess and Chalais, defendant also argues there is insufficient evidence he took a direct but ineffectual act toward accomplishing the attempted murders of those two officers. "For an attempt, the overt act must go beyond mere preparation and show that the killer is putting his or her plan into action; it need not be the last proximate or ultimate step toward commission of the crime or crimes [citation], nor need it satisfy any element of the crime [citation]." (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 8.)

Defendant argues primarily that he did not fire at either officer and did not point the shotgun *directly* at either officer. Both officers testified he was only turning toward them or panning for a target, not that the barrel was pointed at them as a *specific* target. The evidence discussed above, considered with the appropriate deference to the jury's verdict, constitutes ample evidence defendant took a direct, but ineffectual step toward the attempted murder of Officers Suess and Chalais.

12

Finally, defendant argues counts 5 and 6 (assault with a firearm on Officers Chalais and Suess) are not supported by sufficient evidence. Defendant contends the evidence, taken as a whole, shows defendant had not even seen the officers, let alone formed a general intent to commit an assault. The argument is not persuasive. The same evidence discussed above is more than adequate to support the assault with a firearm counts.

## 2. The Unanimity Instruction

Defendant contends the court committed instructional error by refusing to give the unanimity instruction (CALCRIM No. 3500) as to counts 1 and 3, the attempted murder and the assault with a firearm counts pertaining to Officer Nelson. We review a claim of instructional error de novo. (*People v. Alvarez* (1996) 14 Cal.4th 155, 217.) We find no error.

There is no dispute that "[i]n a criminal case, a jury verdict must be unanimous. . . . Additionally, the jury must agree unanimously the defendant is guilty of a specific crime. Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*), citations omitted.)

Here, the court did instruct with CALCRIM No. 3500, but limited its application to counts 8 (evading a peace officer) and 9 (child endangerment), specifically denying the defense request to give the instruction as to counts 1 and 3 as well. The instruction read to the jury provided: "The defendant is charged with evading a peace officer with wanton disregard for safety in Count 8. [¶] The defendant is charged with child abuse likely to produce great bodily harm in Count 9. [¶] The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

13

The purpose behind the unanimity instruction is " 'to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.' [Citation.]" (*Russo*, *supra*, 25 Cal.4th at p. 1132.) The instruction is appropriately given " 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories *or acts* may form the basis of a guilty verdict on one discrete criminal event.' [Citation.]" (*Id*. at p. 1135, italics added.) What has become known as the "continuous course of conduct" exception to the unanimity instruction, applies when the defendant's " ' "acts are so closely connected that they form part of one and the same transaction, and thus one offense." ' " (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 572.) Where the exception applies, the instruction need not be given. (*Ibid*.)

Defendant contends the counts regarding Officer Nelson, the initial pursuing officer, consisted of multiple separate acts of brandishing and/or firing the shotgun and that the jury had to be instructed to agree on which of those discreet acts constituted the attempted murder and the assault with a firearm.

We disagree. The evidence does not support a parsing of the pursuit by Officer Nelson into discreet criminal acts. Officer Nelson testified to the "fluid" nature of the pursuit, that events unfolded rapidly, and that the entirety of his pursuit of defendant took no more than six to seven minutes. Defendant was driving at high rates of speed, in a reckless manner, intermittently brandishing or firing the shotgun at Officer Nelson at the same time. The trial court properly declined to give the unanimity instruction as to counts 1 and 3 based on the continuous course of conduct exception.

### 3. The Admission of Exhibit P69

Defendant contends the court abused its discretion in admitting the prosecution's exhibit P69, the one-page report from defendant's hospital medical records. Respondent contends defendant forfeited any substantive objection to the exhibit, having stated only a foundational objection at trial. Respondent further contends, on the merits, the document was properly admitted, and that any error in its admission was harmless.

14

We first address the admission of the exhibit as a business record. Defendant properly preserved an objection on this ground. "A trial judge is vested with wide discretion in determining whether a proper foundation has been laid for admission of business records under the business records exception. [Citation.] 'Where the trial court has determined that the foundation laid was sufficient to support the introduction of evidence under the business records exception, and the record reasonably supports this determination, its conclusion is binding on the appellate court.' [Citation.]" (*People v. Zavala* (2013) 216 Cal.App.4th 242, 245-246.)

The court determined the foundation for the exhibit as a business record was properly established by way of affidavit attached to the medical records delivered to the court pursuant to a subpoena. (Evid. Code, §§ 1271, 1560, 1561; see also *Cooley v. Superior Court* (2006) 140 Cal.App.4th 1039, 1045 [section 1561 was amended in 1996 " 'to ensure that such [nonparty business] records may continue to be admissible without requiring their authenticity to be proved through live testimony from the custodian of records or other qualified witness' "], and *People v. Blagg* (1968) 267 Cal.App.2d 598, 609-610 [hospital records properly authenticated as to foundation by way of affidavit].)

The appellate record was augmented with a copy of exhibit P69, but there is nothing in the record regarding the contents of the custodian's affidavit. Nor does the record contain any objection that the affidavit was defective in any way. The objection as to foundation was *only* that it should have been established with live testimony. Defendant has not affirmatively shown any abuse by the court in finding a proper foundation for admission of exhibit P69 as a business record.

The question then becomes whether it was proper to admit exhibit P69 without redaction of the apparent hearsay statement of a police officer documented by hospital personnel in the "brief history" section of the record to the effect that defendant had been shot "by LAPD" officers, "while attempting to escape," and "was shooting at police." "Multiple hearsay is admissible for its truth *only* if each hearsay layer separately meets the requirements of a hearsay exception." (*People v. Arias* (1996) 13 Cal.4th 92, 149, italics added.)

15

Assuming for the sake of argument there was no waiver and that the court erred in admitting exhibit P69 without redactions, any such error was harmless by any standard. The exhibit was offered by the prosecution during rebuttal, apparently in response to testimony by defendant's girlfriend that she perceived the wounds suffered by defendant were to his back, suggesting he was not facing the officers when he was shot. The exhibit was briefly shown to the jury enlarged on the video monitor without any additional accompanying testimony. It was not highlighted in argument.

The prosecution evidence presented against defendant in its case-in-chief was substantial. The jury heard numerous officers, and two carjacking victims, testify to defendant's dangerous and violent behavior during the course of a high-speed pursuit through congested city streets with defendant's five-year-old son in the backseat of the first car defendant commandeered. The jury saw photographs of defendant's injuries, heard audiotape of the radio transmissions during the pursuit, and videotape from Officer Suess's dashboard camera showing the final stages of the pursuit, including the shooting of defendant at the conclusion of the chase. In relation to such evidence, any prejudice to defendant from the admission of exhibit P69 was harmless.

## DISPOSITION

The judgment of conviction is affirmed.

GRIMES, J.

We concur:

BIGELOW, P. J.

RUBIN, J.

16