Filed 3/9/16  P. v. Jenkins CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JAMES DEAN JENKINS,<br><br>    Defendant and Appellant. | F069275<br><br>(Super. Ct. No. 13CM2857)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Donna L. Tarter, Judge.

John Hardesty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant James Dean Jenkins challenges his conviction for attempted premeditated murder of a peace officer. The events giving rise to the multiple charges against him arose from a traffic stop and subsequent high-speed vehicle pursuit on the night of June 3, 2013. Defendant was charged with five felony counts: attempted premeditated murder of a peace officer in violation of Penal Code sections 664, subdivisions (e) and (f), and 187, subdivision (a), (count 1); two counts of assault with a deadly weapon on a peace officer in violation of Penal Code section 245, subdivision (c), (counts 2 and 3); one count of operating a motor vehicle with willful or wanton disregard for the safety of persons while fleeing from a pursuing police officer in violation of Vehicle Code section 2800.2, subdivision (a), (count 4); and one count of willfully operating a motor vehicle in a direction opposite to lawful traffic during flight from a pursuing peace officer in violation of Vehicle Code section 2800.4 (count 5). Defendant was also charged with six misdemeanors and one infraction (counts 6 through 12). As to counts 1 through 5, the information alleged that defendant suffered three prison priors pursuant to Penal Code section 667.5, subdivision (b); and as to counts 7 through 9, the information alleged that he suffered a prior conviction for driving with a suspended license in violation of Vehicle Code section 14601.1. The amended information alleged a prior serious felony pursuant to the three strikes law (Pen. Code, §§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) as to counts 1 through 5.

The trial court granted the prosecution's motion to dismiss counts 8 and 9, and the parties agreed the trial court would decide count 12, the infraction. The jury convicted defendant of counts 1 through 7, 10, and 11. In a bifurcated proceeding, defendant waived jury trial on the prior allegations, and the trial court found the three prison term enhancements true and the prior strike conviction not true. Defendant was sentenced to an indeterminate sentence of 15 years to life on count 1. The court imposed consecutive sentences of five years (upper term) on count 3, and eight months on each of counts 4 and

2.

5 (one-third of two-year midterm), for a total of six years four months. Defendant received credit for time served on counts 6, 7, and 10. The sentences for counts 2 and 11 were stayed pursuant to Penal Code section 654, and he was fined $100 for count 12 (the infraction). He was also sentenced to one additional year for each prison prior, resulting in a total aggregate determinate sentence of nine years four months.

On appeal, defendant argues there was insufficient evidence to support his conviction for attempted premediated murder (count 1) and the prosecutor committed misconduct by misstating the law as well as introducing facts not in evidence.

We affirm the judgment.

## FACTUAL SUMMARY

Through testimony by the two deputies involved, the People presented the following evidence concerning the traffic stop and subsequent vehicle pursuit.[1] On June 3, 2013, at approximately 9:00 p.m., Kings County Sheriff's Deputy Cole Souza was on assigned patrol in the area of Kansas Avenue and State Route 43, a rural area. Souza was in uniform and driving a marked patrol car with overhead lights. Following his completion of a traffic stop involving another vehicle, Souza pulled up behind a 1975 Ford Maverick stopped at a red stoplight on Kansas Avenue. Souza noticed the vehicle's registration tags were expired and he ran the plate through the county dispatch center, which confirmed the registration for that vehicle was expired. When the light changed from red to green, Souza activated his overhead emergency lights to initiate a traffic stop. The vehicle yielded and pulled over on the shoulder. Souza exited his patrol car, approached the driver's side window, identified himself as a deputy sheriff, stated he stopped the driver for expired registration, and asked for the driver's license, proof of insurance and registration. Defendant stated he had just purchased the vehicle, he did not yet have insurance, and he did not have his driver's license on him but he had one,

---

[1] Defendant elected not to testify at trial. His witnesses were his wife, Laurie Jenkins, who testified as an alibi witness, and Deputy Souza.

3.

although he believed it was expired. Defendant provided a name of James G. Buchholtz and a birthdate of April 29, 1968. Souza returned to his patrol car and ran the information, which did not match a driver's license. Souza returned to the Maverick and informed defendant he did not believe he was being truthful. Defendant hung his head, admitted to giving Souza a false name, and said he might have a misdemeanor warrant out of Tulare County. Souza told defendant that misdemeanor warrants did not necessarily require being jailed and due to jail overcrowding, "a lot of times" he was able to issue just a ticket and a new court date. Defendant then told Souza his name was James Dean Jenkins and his birthdate was April 29, 1969, and he provided a driver's license number from memory. Remaining by the driver's side window, Souza relayed the information to the dispatcher and was informed there were two warrants out for defendant's arrest, one of which was a no bail warrant.

Souza ordered defendant to step out of the car. Defendant did not comply and asked if he was being taken in. Souza informed him he was under arrest and going to jail. Souza again ordered him to get out of the car. Defendant began revving the motor at a very high RPM while looking Souza directly in the eyes. Defendant ignored Souza's repeated commands to shut off the car and get out, and repeatedly revved the motor. Souza then attempted to pull defendant from the vehicle through the driver's side window by grabbing his left arm with both hands. However, defendant moved toward the center of the car and began to reach under the seat with his right hand. In Souza's experience, it is very common for people to keep firearms under the seat and, fearing defendant might be reaching for a gun, he took one or two steps back from the vehicle and withdrew his firearm from its holster. Souza yelled at defendant that he was under arrest, and to shut off the car and get out. With the motor still revved up to a high RPM, defendant took off, the wheels of his car burning out and kicking up a lot of dust and debris. Defendant made a U-turn in the road and headed in the opposite direction. Souza holstered his weapon, radioed dispatch, and began pursuing the car with his lights flashing. At that

4.

point, approximately five minutes had elapsed since Souza first pulled defendant's car over.

Kansas Avenue was a rural, undivided two-lane road with a speed limit of 55 miles per hour. It was dark at 9:00 p.m. and there were few street lights in the area. After defendant took off with Souza in pursuit, they reached speeds between 90 and 100 miles per hour. Two or three times, defendant turned off his vehicle's lights, leaving the car completely dark and undetectable to passing motorists, and crossed over into the oncoming traffic lane. On two or three occasions, oncoming vehicles were forced to make sudden turns and leave the roadway to avoid being hit head-on by defendant. One incident involved a Jeep Grand Cherokee and another incident involved a big rig truck, which fishtailed and went off the road when the driver had to lock up his brakes suddenly to avoid defendant, who was traveling with his headlights off at the time. Defendant subsequently turned on Road 28. The speed limit remained at 55 miles per hour, and the pursuit continued at between 90 and 100 miles per hour. Approximately one-half mile along Road 28, defendant slammed on his brakes for no apparent reason, causing Souza to have to lock up his brakes to avoid colliding with the rear of defendant's car. The chase then continued down a dry, dusty farming access road. Defendant's vehicle was kicking up so much dust that Souza could not see the front of his car. At that point, Souza turned off his flashing lights and siren and proceeded at a slow pace. Souza caught up to the Maverick again when it turned on Road 36, and he picked up the pursuit and notified dispatch.

Defendant and Souza continued to travel at speeds averaging between 80 and 90 miles per hour. Defendant repeatedly turned his lights on and off and drove in and out of his traffic lane. After defendant turned on Avenue 248, he drove onto a residential property with a dirt driveway. Defendant continued toward a shop area on the property and began spinning "brodies" in the dirt, kicking up so much dust that Souza could not see anything. Periodically, Souza could see defendant's headlights and taillights through

the dust, followed by loss of visibility due to thick dust in the air. Souza cracked his window and could hear defendant revving the motor. During one of the revolutions, defendant's car came within a few feet of hitting Souza's patrol car. Defendant eventually made his way back onto the roadway, with Souza following behind once he realized defendant had left the residential property.

Kings County Sheriff's Deputy W. Brabant, Jr., was also on duty that night, patrolling an area approximately eight miles from Souza's pursuit of defendant. At 9:35 p.m., he headed toward Souza's location to assist with the pursuit. Brabant was also in a marked patrol car, and the flashing lights and siren were activated. He was traveling at approximately 80 miles per hour when he caught sight of a silhouette in the dark. Once his headlights caught the silhouette, he saw it was a vehicle traveling toward him. When the unlit vehicle was approximately 100 to 150 yards away from him, the driver switched on the headlights and swerved into Brabant's traffic lane, coming toward him head-on. Brabant reflexively jerked the steering wheel to the right and his patrol car went onto the shoulder of the road. Brabant lost some control of the car due to the loose dirt on the shoulder and he saw he was heading directly for a power pole. Brabant "whipped the wheel" back to the left to regain control. Defendant's vehicle remained on the wrong side of the road in Brabant's lane. Brabant did not observe brake lights and he heard the vehicle continue to accelerate away, building speed.

After Brabant was back on the roadway, he was the first vehicle in pursuit of defendant, with Souza following behind.[2] Brabant could see a 1970's model Ford Maverick, subsequently identified as defendant's, ahead of him traveling at approximately 100 miles per hour. Souza and Brabant continued pursuing defendant at speeds between 60 and 70 miles per hour. Defendant continued to turn his lights on and

---

[2] Brabant was a K-9 handler, and K-9 units generally take the first position in a vehicle pursuit, in the event the dog is needed to apprehend a fleeing driver.

off and cross over into the oncoming traffic lane. After turning on yet another road, defendant ran a stop sign in excess of 100 miles per hour. Defendant then turned on another dirt road and kicked up so much thick dust that Souza and Brabant were forced to discontinue the pursuit. It was approximately 10:00 p.m. when they discontinued their pursuit of defendant. Souza, Brabant, and other law enforcement officers subsequently canvassed the area for defendant, without success.

When Souza returned to the substation that night, he pulled up the DMV photo on the computer using the information defendant had provided during the traffic stop. The photo for James Dean Jenkins matched the driver he had been pursuing in the Maverick. Several hours later, Souza was notified by a Tulare County Police Department sergeant that defendant's vehicle had been located behind a Walmart in Tulare.

## DISCUSSION

### I. Sufficiency of the Evidence

Defendant was convicted of the willful, deliberate, and premeditated attempted murder of Deputy Brabant (count 1). As to this count, he argues that the evidence was insufficient to support the jury's findings of either intent to kill or deliberation and premeditation.

#### A. Standard of Review

On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the

7.

existence of every fact the jury could reasonably have deduced from the evidence. [Citation.]" (*Ibid.*) "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ….' [Citation.]" (*People v. Nguyen*, *supra*, at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio*, *supra*, at p. 357.)

## B. Specific Intent to Kill

Unlike murder, "attempted murder is not divided into degrees, but the sentence can be enhanced if the attempt to kill was committed with premeditation and deliberation. [Citation.]" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 654.) Attempted murder requires specific intent to kill, or express malice, "'and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 739.) Express malice is shown when the defendant "'either desires the victim's death, or knows to a substantial certainty that the victim's death will occur.' [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.) "[E]vidence of motive is often probative of intent to kill," but it "is not required to establish intent to kill." (*People v. Smith*, s*upra*, at p. 741.) Intent "may in many cases be inferred from the defendant's acts and the circumstances of the crime." (*Ibid.*)

Deputy Brabant testified that he was driving along a rural two-lane road at approximately 80 miles an hour with his patrol car emergency lights and siren activated. It was nighttime and the area was completely dark. Brabant caught sight of a silhouette in the road, and a vehicle's headlights then turned on and it crossed over into Brabant's lane, moving straight toward him, head-on and at high speed. Brabant reflexively yanked the wheel to the right, avoiding a collision.

The jury could have reasonably inferred from the events that defendant was in full control of his vehicle, was well aware Brabant was approaching at a high speed, and intentionally concealed his vehicle's visibility by keeping the lights off until Brabant was

8.

approximately 100 to 150 yards away, at which time he changed lanes and aimed directly for Brabant's rapidly approaching car. Further, given these actions and the high speed involved, the jury could have reasonably inferred that defendant desired to kill Brabant, or knew to a substantial certainly that Brabant's death would occur. That Brabant "may have escaped death" in a head-on collision by virtue of his reflexive reaction in jerking his steering wheel to the right does not "necessarily establish a less culpable state of mind." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945.) Even if these facts might be reconcilable with a contrary finding, as defendant argues, that is not grounds for reversal. (*People v. Booker* (2011) 51 Cal.4th 141, 172). There was sufficient evidence to support defendant's conviction for attempted murder, and the jury's finding is affirmed.

## C.      Deliberation and Premeditation

Defendant next argues there was insufficient evidence to support the enhancement for deliberate, premediated attempted murder of a peace officer. More than a specific intent to kill is required to support a finding of deliberation and premeditation. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) "'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]" (*Ibid.*) "'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.…" [Citations.]' [Citation.]" (*Ibid.*)

"In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27, [the Supreme Court] reviewed earlier decisions and developed guidelines to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation. [Citation.] [The court] described three categories of evidence recurring in those cases: planning, motive, and manner of killing. [Citations.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419–420.) "[H]owever, '[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate.'" (*People v. Koontz, supra*, 27 Cal.4th at p. 1081.)

9.

The "guidelines are descriptive and neither normative nor exhaustive, and … reviewing courts need not accord them any particular weight. [Citation.]" (*People v. Halvorsen*, *supra*, at p. 420.)

Here, defendant's actions toward Deputy Brabant occurred approximately 30 minutes after he fled the scene of the traffic stop and during the course of a high-speed pursuit that lasted approximately one hour. Prior to changing lanes and speeding directly toward Brabant, defendant had repeatedly turned his headlights off and on, changed lanes into the oncoming traffic lane, and caused two vehicles to swerve to avoid being hit by him head-on. Given the extended passage of time that occurred prior to encountering Brabant and defendant's engagement in similar conduct during that time period, there was sufficient evidence from which a reasonable jury could have concluded that defendant reflected on his options and determined he would evade capture even at the cost of life, including his own. This demonstrates planning.

Evidence of motive is also present. Defendant thought he might have a warrant out for his arrest and, immediately prior to his flight from Deputy Souza, he had been told to get out of the car because he was under arrest. The ensuing high speed chase resulted from defendant's determination to avoid arrest, and, contrary to his argument, it is immaterial that he did not know Brabant personally or know the identity of the patrol car's driver. (*See People v. Stone* (2009) 46 Cal.4th 131, 139.) Given the dark conditions and the approaching patrol car's flashing emergency lights and wailing siren, defendant knew the car coming toward him was a law enforcement vehicle, supporting a reasonable inference that defendant's actions in changing lanes and driving directly toward the car at high speed were motivated by his determination to avoid apprehension.

In sum, although the *Anderson* factors "'are not a sine qua non … nor are they exclusive'" (*People v. Koontz*, *supra*, 27 Cal.4th at p. 1081), we nonetheless reject

10.

defendant's argument that there was insufficient evidence as to any of the factors.[3]  To the contrary, there was evidence of planning (factor 1) and motive (factor 2) from which a reasonable jury could have concluded that defendant's action toward Brabant "'was the result of "a preexisting reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation] ….'" (*People v. Koontz*, *supra*, at p. 1081.)  "[A] killing resulting from preexisting reflection, of any duration, is readily distinguishable from a killing based on unconsidered or rash impulse." (*People v. Solomon* (2010) 49 Cal.4th 792, 813.)  Here, evidence of the timeline of the events and the specific actions taken by defendant is sufficient to support the jury's finding of willful, deliberate, and premeditated attempted murder, and the finding is affirmed.

## II.    Prosecutorial Misconduct

Defendant also argues on appeal that the prosecutor committed misconduct by misstating the law and introducing facts not in evidence during closing argument, in violation of his federal right to due process and right to a fair trial.

### A.    Standard of Review

"'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated.  Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 835.)  "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable

---

[3]    Respondent concedes the inapplicability of factor 3, manner of killing.  We agree the facts do not evidence "a manner of killing that reflects a preconceived design to kill." (*People v. Gonzalez, supra*, 54 Cal.4th at pp. 663–664.)

likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citations.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

"'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.]" (*People v. Maciel* (2013) 57 Cal.4th 482, 541.) "[O]nly if an admonition would not have cured the harm is the misconduct claim preserved for review. [Citation.]" (*People v. Cook* (2006) 39 Cal.4th 566, 606.) However, "'[a] defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' [Citation.]" (*People v. Centeno*, *supra*, 60 Cal.4th at p. 674.)

In this case, trial counsel failed to object to the prosecutor's statements during trial, and respondent argues that defendant forfeited his prosecutorial misconduct claims on appeal as a result. Recognizing this, defendant seeks to excuse trial counsel's failure to object on the ground of ineffective assistance of counsel. However, the forfeiture issue aside, the prosecutor's statements did not constitute error. It is therefore unnecessary for the court to determine whether defendant's prosecutorial misconduct claims are forfeited or whether trial counsel's failure to object to the prosecutor's statements constituted ineffective assistance of counsel.

B.    Analysis

1.    Misstatement of Law

Defendant argues that the prosecutor conflated the nonexistent crime of second-degree attempted murder with the attempted murder charge in count 1 when she told "the jury that [defendant] committed attempted premeditated murder by intentional acts that

12.

placed Brabant and his K-9 partner 'in danger' due to the possibility of a head-on collision at high speeds from which 'it's reasonable to believe someone's going to die or at least get severely injured.'" In response, respondent asserts that defendant's "real complaint is that the prosecutor was arguing the facts in such a way that they could support a lesser degree [attempted] murder charge," and "[e]ven assuming for the sake of argument that the prosecutor's argument to the jury demonstrated that the facts would support a second degree [attempted] murder conviction, the prosecutor properly argued that the evidence supported attempted first degree murder and at no time misstated the law."

We find no prosecutorial error. Prior to the remark at issue, the prosecutor told the jury they were required to follow the law as instructed by the judge and she reiterated the People's burden of showing "defendant took at least one direct but ineffective step toward killing another person, and … defendant intended to kill that person." The jury had been instructed by the trial court as to count 1 and no instructional errors are asserted on appeal. Further, in their closing arguments, the prosecutor and trial counsel both addressed the need for defendant to have possessed specific intent to kill to support a guilty finding on count 1; and specific intent was addressed by the prosecutor in her closing argument both before and after the statement at issue. Under these circumstances, we reject defendant's argument that the statement rose to the level of prosecutorial error. At worst, the statement amounted to poor word choice, and there is simply no merit to an argument that the statement "infect[ed] the trial with unfairness" or "involve[d] the use of deceptive or reprehensible methods of persuasion. [Citation.]"**4** (*People v. Booker*, *supra*, 51 Cal.4th at p. 184.)

---

**4**      Moreover, even if we were to assume prosecutorial error, there was no prejudice. (*See People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 429.)

13.

## 2. Introduction of Facts Not in Evidence

Defendant also argues that the prosecutor introduced facts not in evidence when, in her rebuttal argument, she stated to the jury, "[W]hen one is 'trying to play chicken' on the highway, you eventually brake when you get too close to the person or you move over. That's not what happened." Respondent contends that the prosecutor's statement was made in direct response to an argument made by defendant's counsel during his closing argument and was not an introduction of facts not in evidence.

Referring to facts not in evidence is misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 827–828). Further, "[a]lthough prosecutors have wide latitude to draw inferences from the evidence presented at trial, mischaracterizing the evidence is misconduct. [Citations.]" (*Id.* at p. 823.) Neither occurred.

The prosecutor's remark regarding "trying to play chicken" did not refer to facts not in evidence but instead was a comment responsive to trial counsel's characterization of the evidence relating to count 1. During defendant's closing argument, trial counsel stated, "I come over, I'm going to try to have a head-on collision with him? That's my intent? No. He's going to get out of my way. That's what I'm trying to do, I'm trying to get away, I'm not trying to crash. He's going to get out of the way. He's not going to head-on with me anymore than I want to head-on with him. [¶] I want him to get out of my way and I want to get on my way. He's going to hit his brakes, he's going to pull over and I'm going to sail on by.…" We agree with respondent that the prosecutor merely affixed a label to trial counsel's characterization of defendant's actions and, in doing so, the prosecutor used a commonly known term for such actions. The attachment of this label to trial counsel's description of events was neither an introduction of facts not in evidence nor a mischaracterization of the evidence. Thus, no prosecutorial error occurred.

14.

## DISPOSITION

The judgment is affirmed.

                                          _____

                                               KANE, Acting P.J.

WE CONCUR:


_____

FRANSON, J.


_____

SMITH, J.

15.