[No. B051701. Second Dist., Div. Two. Dec. 16, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK SHANE LASHLEY, Defendant and Appellant.

**COUNSEL**

John D. O'Loughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, Geroge Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Donald E. de Nicola and William T. Harter, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

HART, J.*—Defendant Mark Shane Lashley was convicted in a court trial of attempted murder (Pen. Code[1], §§ 187, subd. (a), 664), assault with a firearm (§ 245, subd. (a)(2)), civil rights violations (§§ 422.6, 422.7), and brandishing a weapon (§ 417, subd. (a)(2)). Enhancement allegations for personal use of a firearm and intentional infliction of great bodily injury during the attempted murder and assault with a firearm charges were found to be true (§§ 12022.5, 12022.7). Following the denial of his motion for new trial, defendant was sentenced to state prison for an aggregate term of 14 years and 8 months. This appeal follows. We affirm.

### FACTS

*Prosecution's Evidence*

This sad tale of racial asperity began June 26, 1988, when Terence Goudeau and his three cousins, Dennis, Kelvin, and Trenton Wilson, decided to fish along the shore of Ballona Creek in Marina Del Rey. Failing to notice a sign prohibiting fishing and trespassing in the area, the group walked the short distance from their car to the rocky bank of the channel. As they passed an adjacent apartment complex, defendant, who was leaning over his second story balcony railing, yelled out, "What kind of fish you gonna catch, black fish?" Goudeau caustically replied that he and his companions, each of whom was Black, were planning to catch "white fish." Apparently angered by the answer, defendant, who was white, retorted with several racial epithets, addressing the men as "niggers" and "darkies" while demanding that they "take [their] Black asses back to Harlem." After countering with an obscenity of his own, Goudeau and the others attempted to ignore the slurs but to no avail. Defendant, who had been joined on the balcony by several of his friends, persisted in taunting the group and, at one point, warned that he would send someone down "to kick ass."

Shortly thereafter, one of defendant's cohorts, Christopher Flores, appeared at the scene and walked toward where the men were fishing. Appearing heavily intoxicated, Flores confronted 12-year-old Trenton Wilson, challenging him to fight. Goudeau, carrying a pocket knife he had been using to

---

*Judge of the Municipal Court for the Los Angeles Judicial District sitting under assignment by the Chairperson of the Judicial Council.

[1]All further statutory references are to the Penal Code unless otherwise specified.

cut bait, essentially told Flores that neither he nor Trenton would fight. Noticing the knife, Flores retreated but not before warning the group that he would "show [them] a real knife." As he staggered away, both Goudeau and Trenton returned to fishing.

Some five minutes later both Goudeau and Trenton turned toward the apartment building and saw defendant posed on the balcony aiming a .22-caliber rifle in their direction. Goudeau yelled to a man standing on the balcony directly above defendant to summon the police and then attempted to position himself between the gunman and Trenton. Before Goudeau could move out of range, however, a shot rang out striking the upper portion of his left arm and piercing his lung.[2] Carried to safety by one of his cousins, Goudeau lay bleeding on the ground when Flores again approached, this time wielding a hunting knife. After remarking that the group should have avoided tangling with him because he was "no ordinary white boy," Flores stumbled back toward the apartment complex. Police and paramedics arrived shortly thereafter.

During the investigation which followed, several persons confirmed that they had seen defendant and Flores on the balcony, heard the racial epithets, observed the initial confrontation between Goudeau and Flores, heard the shot, and witnessed an intoxicated Flores return to the scene after the shooting with knife in hand. Defendant, having fled to Sacramento immediately after the incident, could not be found. Based upon the reports of both the victims and witnesses, officers at the scene arrested Flores and transported him to the station.[3] While en route, he volunteered that immediately after the shooting he had returned to the apartment where defendant, holding a rifle, announced that he had fired at Goudeau in order to protect Flores from being attacked. Flores later was released without being charged and defendant surrendered shortly thereafter to authorities in Sacramento.

*Defense Evidence*

Testifying for the defense at trial, Flores essentially claimed that he, not Goudeau, had been the victim of an unprovoked and racially motivated attack. He recalled first observing the group from the balcony of defendant's apartment as they passed near the building on their way to the shore. When Flores inquired about the kind of fish they were hoping to catch, Goudeau replied, "white fish." Ignoring the comment, Flores returned inside the

[2]At the time of the shooting, Goudeau was located approximately 20 yards from the apartment complex.

[3]Several of the arresting officers who testified at trial substantiated the opinions of various prosecution witnesses that Flores was intoxicated both before and after the shooting.

apartment, gathered several bags he needed for a trip, and then proceeded downstairs to the carport. As he unlocked the trunk of his vehicle, he heard Goudeau order him outside. Flores walked to a retaining wall near where Goudeau was standing and inquired what he wanted. When Flores declined a challenge to fight, Goudeau pulled a buck knife from behind his back and made a stabbing motion in the air. Two of the men who had been fishing also drew knives and, along with Goudeau, surrounded Flores blocking his escape. While attempting to move toward the apartment building, Flores heard a "pop" and then saw the men scatter in the direction of the water.

After reaching the carport, Flores grabbed a knife and returned to where he had been confronted by the group. Goudeau, who was on the ground bleeding, ordered the others to "kill that honky motherfucker." Hearing that the police had been summoned, Flores walked back to the carport, placed the knife in his vehicle, and then returned to the scene, exclaiming that he was "no ordinary white boy." He later was arrested and taken to jail. Although admitting he had told the officers of defendant's involvement in the shooting, Flores claimed at trial he had concocted the story solely to secure his release from custody. He also denied being heavily intoxicated at the time of the incident.

Defendant, along with several other defense witnesses, essentially testified in support of Flores's account of the shooting and the events preceding it. Denying any racial motivation for his actions, defendant maintained that upon seeing Flores threatened at knifepoint by Goudeau and the others he felt compelled to defend his friend. He insisted, however, that in firing the rifle his intent was not to kill Goudeau but only to wound him. Although he denied making any statement to Flores immediately after the shooting, defendant admitted departing for Sacramento soon after the incident and disposing of the rifle en route. Other evidence introduced by the defense went to proving that neither defendant nor Flores was drunk on the day of the shooting and that one of the men in the group had threatened Flores with a switchblade.

## DISCUSSION

*Sufficiency of the Evidence to Support Defendant's Conviction for Attempted Murder*

 ██ █ In urging us to reverse the judgment of conviction for attempted murder, defendant contends that the evidence is insufficient to

establish that he possessed the specific intent to kill.[4] The argument rests on the notion that had he truly intended to kill Goudeau he would have fired more than one shot at his target or taken some other action to insure the accuracy of his aim. The evidence, he claims, demonstrates at most an intent to disable or to inflict serious bodily injury. We think not.

The question of defendant's intent at the time of the shooting was a factual issue that the trial court determined adversely to him. The only possible reason for reaching a different result here rests on the untenable theory that an unsuccessful killing constitutes conclusive evidence of lack of intent. There is nothing inherently illogical or absurd in a finding that a person who unsuccessfully attempted to kill another did so with the intent to kill. The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance. Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind.

Viewing the evidence in the light most favorable to the judgment, as we must (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110]; *People* v. *Woods* (1991) 226 Cal.App.3d 1037, 1049 [277 Cal.Rptr. 269]), there was sufficient evidence from which the trial court could find that defendant harbored the requisite intent necessary to support his conviction for attempted murder. Defendant's conduct prior to the shooting, which included a threat to do bodily harm, combined with the testimony that he took aim before firing, and the seriousness of the victim's injuries constitutes substantial evidence on the issue of intent. The very act of firing a .22-caliber rifle toward the victim at a range and in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill under the circumstances presented here. Contrary to the argument advanced on this appeal, the evidence need not show in every instance a firing at point-blank range before the trier of fact may conclude that the shooter unambiguously intended to kill. While such evidence undoubtedly creates a strong inference that the killing was intentional (see *People* v. *Jackson* (1989) 49 Cal.3d 1170, 1201 [264 Cal.Rptr. 852, 783 P.2d 211]; *People* v. *Bloyd* (1987) 43 Cal.3d 333, 348 [233 Cal.Rptr. 368, 729 P.2d 802]; *People* v. *Wells* (1988) 199 Cal.App.3d 535, 541 [245 Cal.Rptr. 90]), it is not the exclusive means of proving so.

One who intentionally attempts to kill another does not often declare his state of mind either before, at, or after the moment he shoots. Absent

---

[4]The parties agree, as they must, that a specific intent to kill is a requisite element of attempted murder, and that mere implied malice is an insufficient basis on which to sustain such a charge. (See *People* v. *Lee* (1987) 43 Cal.3d 666, 670 [238 Cal.Rptr. 406, 738 P.2d 752]; *People* v. *Guerra* (1985) 40 Cal.3d 377, 386-387 [220 Cal.Rptr. 374, 708 P.2d 1252].)

such direct evidence, the intent obviously must be derived from all the circumstances of the attempt, including the putative killer's actions and words. Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact. ■ While reasonable minds may differ on the resolution of that issue, our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781]; see also *People* v. *Johnson* (1980) 26 Cal.3d 557, 575-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Due process of law does not require a reviewing court to reweigh evidence or redetermine witness credibility. In fact, it would distort the process if this court, reading a "cold" record, substituted its judgment for that of the trier of fact who saw and heard the live witnesses. Our role is to determine the legal sufficiency of the found facts and not to second guess the reasoning or wisdom of the fact finder.

■ Here, the trial court, sitting as the trier of fact, had sufficient evidence before it from which it could find that defendant intended to mortally wound his target at the time he aimed and fired the rifle. The court was free to reject, as it necessarily did, defendant's self-serving testimony that he intentionally shot toward Goudeau intending merely to scare or to inflict a nonfatal wound. Viewed in this light, the conviction for attempted murder must stand.

*Sufficiency of the Evidence to Support Defendant's Convictions for Civil Rights Violations*

Defendant's next contention concerns the nature and quantum of evidence required to sustain his convictions for civil rights violations under sections 422.6 and 422.7.

Former section 422.6 made it a crime, punishable as a misdemeanor, for any person, whether or not acting under color of law, to interfere by force, threats of force, intimidation, or coercion with another person's exercise or enjoyment of constitutional or statutory rights because of "the other person's race, color, religion, ancestry, national origin, or sexual orientation."[5] As we shall explain, defendant's conviction under this statute stemmed from his shooting of Terence Goudeau.

---

[5]Former section 422.6 read in pertinent part as follows:

"(a) No person, whether or not acting under color of law, shall by force or threat of force, willfully injure, intimidate or interfere with, oppress, or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him or her by the Constitution or laws of this state or by the Constitution or laws of the United States because of the other person's race, color, religion, ancestry, national origin, or sexual orientation.

". . . . . . . . . . . . . . . . . . . . . . . . . .

Section 422.7 likewise makes it a crime, punishable as a felony, for any person to commit a misdemeanor offense (except one under § 422.6) against another's person or property "for the purpose of intimidating or interfering with that other person's free exercise or enjoyment of any right secured to him" by federal or state law, "because of the other person's race, color, religion, ancestry, national origin, or sexual orientation." The prosecution also must prove that the underlying misdemeanor offense "either includes the present ability to commit a violent injury or causes actual physical injury." (§ 422.7, subd. (a)).[6] Defendant's conviction under this statute was based on his commission of the misdemeanor offense of brandishing a firearm (§ 417, subd. (a)(2)) against 12-year-old Trenton Wilson.

██ Although the foregoing statutes have yet to be construed by any court of this state, both parties maintain that a conviction under either section requires proof of a specific intent to deprive an individual of a right secured by federal and/or state law. We agree. Both sections are modeled after the federal criminal civil rights statute presently codified in 18 United States Code section 242 and the Massachusetts Civil Rights Act of 1979 (Mass. Gen. Laws, ch. 265, § 37).[7] (See Final Rep., Atty. Gen.'s Com. on Racial, Ethnic, Religious, and Minority Violence, Apr. 1986, pp. 23-24.)

---

"(c) Any person convicted of violating subdivision (a) or (b) shall be punished by imprisonment in the county jail not to exceed six months, or by a fine not to exceed five thousand dollars ($5,000) or by both the fine and imprisonment; provided, however, that no person shall be convicted of violating subdivision (a) based upon speech alone, except upon a showing that the speech itself threatened violence against a specific person or group of persons and that the defendant had the apparent ability to carry out the threat."

[6]Former section 422.7 provided in full:

"Except in the case of a violation of subdivison (a) or (b) of Section 422.6, any crime which is not made punishable by imprisonment in state prison shall be punishable by imprisonment in state prison or in county jail not to exceed one year, or by fine not to exceed ten thousand dollars ($10,000), or by both the fine and imprisonment, if the crime is committed against the person or property of another for the purpose of intimidating or interfering with that other person's free exercise or enjoyment of any right secured to him or her by the Constitution or laws of this state or by the Constitution or laws of the United States, because of the other person's race, color, religion, ancestry, national origin, or sexual orientation, under any of the following circumstances, which shall be charged in the accusatory pleading:

"(a) The crime against the person of another either includes the present ability to commit a violent injury or causes actual physical injury.

"(b) The crime against property causes damage in excess of one thousand dollars ($1,000).

"(c) The person charged with a crime under this section has been previously convicted of a violation of subdivision (a) or (b) of Section 422.6, or has been previously convicted of a conspiracy to commit a crime described in subdivision (a) or (b) of Section 422.6"

[7]United States Code section 242 provides:

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an

Each of these statutes, except for section 422.7, shares the express require-ment that a defendant act "willfully" before a conviction can be had. The Massachusetts and California statutes, however, have broader application than the federal law because they apply to private as well as state action. The seminal case dealing with the element of mens rea under federal law is *Screws* v. *United States* (1945) 325 U.S. 91 [89 L.Ed. 1495, 65 S.Ct. 1031, 162 A.L.R. 1330]. The defendants in that case, law enforcement officials who had beaten a prisoner to death, were charged with denying that individ-ual various of his due process rights under the Fourth Amendment. They countered with a challenge to the predecessor of the current federal statute, arguing that it was unconstitutionally vague because it did not provide fair warning of the nature of the conduct it prohibited. Rejecting this claim, the Supreme Court found that the term "willfully," as used in the statute, meant acting with "a purpose to deprive a person of a specific constitutional right" (325 U.S. at p. 101 [89 L.Ed. at p. 1502]), "made definite by decision or other rule of law" (325 U.S. at p. 103 [89 L.Ed. at p. 1504]). Such a construction, in the court's view, cured any problem of vagueness because a defendant who acts "willfully" is "under no necessity of guessing whether the statute applies to him . . . for he either knows or acts in reckless disregard of its prohibition." (*Id.* at p. 104 [89 L.Ed. at p. 1504].)

In so holding, the court made it clear that "specific intent" under the statute does not require an actual awareness on the part of the defendant that he is violating another's constitutional rights. It is enough that he engages in activity that interferes with rights clearly and specifically protected by the laws of the United States. (325 U.S. at pp. 106-107 [89 L.Ed. at pp. 1505-1506].)

"Although some of the language in *Screws* can be read more broadly, its holding essentially sets forth two requirements for a finding of 'specific intent' under [18 U.S.C.] section 242. The first is a purely legal determina-tion. Is the . . . right at issue clearly delineated and plainly applicable under the circumstances of the case? If the trial judge concludes that it is, then the jury must make the second, factual, determination. Did the defendant com-mit the act in question with the particular purpose of depriving the citizen

alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any terms of years or for life."

The Massachusetts law states in relevant part:

"No person, whether or not acting under color of law, shall by force or threat of force, willfully injure, intimidate or interfere with, or attempt to injure, intimidate or interfere with, or oppress or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him by the constitution or laws of the commonwealth or by the constitution or laws of the United States. . . ."

victim of his enjoyment of the interests protected by that . . . right? If both requirements are met, even if the defendant did not in fact recognize the [unlawfulness] of his act, he will be adjudged as a matter of law to have acted 'willfully'—*i.e.*, 'in reckless disregard of constitutional [or statutory] prohibitions or guarantees.' " (*United States* v. *Ehrlichman* (D.C. Cir. 1976) 546 F.2d 910, 921; see also *Commonwealth* v. *Stephens* (1987) 25 Mass.App. 117 [515 N.E.2d 606].)

We agree with the reasoning of *Screws* and its progeny and find it clearly applicable to prosecutions under section 422.6. This is especially so, given that the state and federal statutes share similarities in language, purpose, and effect. Although we recognize that the language of section 422.7 is somewhat different from its federal counterpart in that it does not contain the word "willfully," we are convinced that the specific intent requirement imposed in *Screws* is applicable to its provisions. The wording of the statute parallels that used by the Supreme Court in discussing the mens rea needed to establish a violation under federal law. The phrase "if the crime is committed . . . for the purpose of . . . interfering with [the] free exercise or enjoyment of any right" unequivocally defines a specific intent crime.

The conduct which sections 422.6 and 422.7 is intended to reach is not the mere reckless use of force, even if motivated by ill will, but rather the execution of a specific purpose to deprive another individual of his or her civil rights. This does not mean, however, that the prosecution must show that the defendant acted with knowledge of particular provisions of state or federal law, or that the defendant was even thinking in these terms. It is sufficient if the right is clearly defined and that the defendant intended to invade interests protected by constitutional or statutory authority. (See *United States* v. *Guest* (1966) 383 U.S. 745 [16 L.Ed.2d 239, 86 S.Ct. 1170]; *United States* v. *Stokes* (5th Cir. 1975) 506 F.2d 771; see also 1 Sand et al., Modern Federal Jury Instructions, Civil Rights, § 17.7.)

■ With these principles in mind, we consider defendant's claim that the evidence elicited at trial is insufficient to support any finding of specific intent under either section 422.6 or 422.7.

Pursuant to section 422.6, an amended information charged that defendant "willfully and unlawfully by force or threat of force injure[d], intimidate[d] or interfere[d] with, oppress[ed] or threaten[ed] Terence Goudeau, because of his race, in violation of the rights secured to him by California Civil Code

section 51.7.[8]" The information further alleged that defendant violated section 422.7 by having "willfully and unlawfully commit[ted] a crime in violation of California Penal Code section 417(a)(2) [brandishing a firearm] against the person and property of victim Trenton Wilson for the purpose of intimidating and interfering with the victim's free exercise and enjoyment of a right secured by California Civil Code section 51.7 and the . . . [state and federal Constitutions] because of the victim's race." The same count went on to allege that the violation of section 417, subdivision (a)(2) "included the present ability to commit a violent injury and cause actual physical injury."

Following the preliminary hearing, defendant filed a motion pursuant to section 995 contending that the statutes, along with the information itself, were unconstitutionally vague. The prosecution essentially responded to that claim by alleging in argument before the court that defendant had interfered with the victims' right to privacy (i.e., the "right to be let alone"), as secured by article I, section 1 of the California Constitution, as well as their right to be free from unlawful personal attacks under Civil Code section 43.[9] It is this allegation, then, which became the theory under which defendant was tried and eventually convicted.

Defendant now contends that the right to privacy was never meant to encompass the type of conduct involved here and that, in any event, the evidence fails to support any interference with the rights guaranteed by Civil Code section 43.

Given the record before us, we need not determine here whether defendant's actions interfered with or otherwise infringed upon the victims' constitutional right to privacy. The evidence elicited at trial is more than sufficient to support the conclusion that defendant intimidated, interfered with, or oppressed the victims in their exercise and enjoyment of the rights secured by Civil Code section 43.[10] In so concluding, we reject the semantical argument advanced by defendant that to interfere with the

---

[8]Civil Code section 51.7 provides in relevant part that "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute."

[9]Civil Code section 43 states:

"Besides the personal rights mentioned or recognized in the Government Code, every person has, subject to the qualifications and restrictions provided by law, the right of protection from bodily restraint or harm, from personal insult, from defamation, and from injury to his personal relations."

[10]The same may be said for the rights protected by Civil Code section 51.7. No matter how the statutory language is phrased it always has been the policy of the law to protect the physical integrity of every person from unauthorized violence. (See *United States* v.

rights secured by the statute "a person would have to interfere with the state's attempt to protect another from . . . injury, or interfere with such person's attempt to secure such protection." This strained interpretation simply does not square with the plain, common sense meaning we must attach to the words of the statute. Even a cursory review of the cases which apply the section establishes that the phrase "right of protection from bodily restraint or harm" refers simply to an individual's right to be free from physical attack or the threat thereof. (See *Lopez* v. *Surchia* (1952) 112 Cal.App.2d 314 [246 P.2d 111]; *Lowry* v. *Standard Oil Co.* (1944) 63 Cal.App.2d 1, 7 [146 P.2d 57].)

The right to be free from violence, or the threat of it, is clearly within the purview of sections 422.6 and 422.7, is well established, and is plainly applicable to the facts of this case. The trial court reasonably could find that defendant's brandishing of the rifle against Trenton Wilson, followed by his shooting of Goudeau, constituted acts of violence and intimidation motivated by racial hatred. This is especially true given the blatantly racial epithets hurled at them by defendant in the minutes preceding the attack. The fact that Goudeau and his cousins may have been trespassing or fishing in an area where such activity was prohibited does not compel a different result. The right to be free from violence surely is not vitiated by one's status as a trespasser under the circumstances of this case. In no event was defendant justified in using deadly or unreasonable force to prevent a trespass upon public lands that posed no apparent danger to himself or others. (See *People* v. *Corlett* (1944) 67 Cal.App.2d 33, 51-52 [153 P.2d 595].)

Whether defendant acted with the specific intent to deprive the victims of their right to be free from such attacks was a question of fact that the court obviously resolved against him. Based upon our review of the record we can only conclude that the record supports that determination. While the evidence may not necessarily show that defendant had a legalistic appreciation of the rights guaranteed by Civil Code section 43, it does establish that he "engage[d] in activity which interferes with rights which as . . . [a] matter of law are clearly and specifically protected by [sections 422.6 and 422.7]." (*United States* v. *Ehrlichman, supra,* 546 F.2d at p. 928.) Nothing more is required.

*Prosecutorial Misconduct*

 Defendant also urges reversal on the ground that the prosecutor committed prejudicial misconduct during his closing argument to the court

*Messerlain* (3d Cir. 1987) 832 F.2d 778, 789; *United States* v. *Bigham* (5th Cir. 1987) 812 F.2d 943 949.)

and that such misconduct was sufficient to show a miscarriage of justice. The argument is premised on the charge that the deputy district attorney repeatedly engaged in unjustifiable attacks on trial counsel, urged his own credibility by injecting his personal beliefs into the trial of the matter, and generally appealed to the passions and prejudices of the court.

Having reviewed each instance of claimed misconduct, we cannot conclude that the prosecutor's remarks contributed in any manner whatsoever to the verdicts rendered here. This is especially true in light of the fact that the arguments advanced by the parties were heard by an experienced trial judge and not a lay jury. We are confident that the court fairly weighed the admissible evidence in reaching its decision without being influenced by counsels' emotional rhetoric. Such is the job of a professional jurist. (See *In re Hernandez* (1966) 64 Cal.2d 850 [51 Cal.Rptr. 915, 415 P.2d 803]; *Solomon* v. *Superior Court* (1981) 122 Cal.App.3d 532, 537 [177 Cal.Rptr. 1].) ■ This is not to condone, however, personal attacks on the character or motives of defense counsel. Such behavior, along with appeals to the prejudice, passions or sympathy of the trier of fact, constitutes clear misconduct. (See 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, §§ 2914, 2916.) ■ Although both counsel hopelessly intertwined principles with personalities during argument, their indelicate remarks toward one another simply do not provide grounds for a wholesale reversal of the judgment of conviction.

*Sentencing*

■ Defendant lastly contends that trial court made an improper use of dual facts when it imposed the upper term of nine years on the attempted murder count. Even assuming that the court erroneously applied certain factors in reaching its decision, defendant is not entitled to a remand for resentencing. The record is clear that at least one of those factors, defendant's having engaged in a pattern of violent conduct indicating a serious danger to society (Cal. Rules of Court, rule 421(b)(1)), is sufficient to support the upper term and remove any reasonable probability of a more favorable sentence in the absence of the other factors.[11] (See *People* v. *Thomas* (1990) 219 Cal.App.3d 134, 149 [267 Cal.Rptr. 908]; *People* v.

[11]The probation report recommended imposition of the upper term based upon the following analysis of defendant's background and conduct:

"This young defendant, with a prior battery conviction, has blatantly disregarded the law, the victim's safety and welfare, and the victim's civil rights. [¶] The defendant initiated a negative racial interaction and continued to taunt the victims with threats of bodily injury and racial slurs before callously and cowardly inflicting a gunshot wound to one of the victims, an injury that can result in the victim becoming paralyzed at any point throughout his life span. [¶] . . . The defendant's actions in the present offense indicate that the discrimination and

*Burrell-Hart* (1987) 192 Cal.App.3d 593, 601 [237 Cal.Rptr. 654]; *People* v. *Dreas* (1984) 153 Cal.App.3d 623, 636-637 [200 Cal.Rptr. 586].) Any error which may have occurred is harmless given the trial court's announced intention to impose the maximum sentence allowable under law.[12]

The judgment is affirmed.

Gates, Acting P. J., and Fukuto, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 25, 1992.

---

racial prejudice is deep-seated and longstanding. [¶] The defendant fails to show total remorse for the victims. He minimizes the extent of the victim's injuries and exhibits responses that convey a message that his actions were, in part, warranted. After near fatally shooting one of the victims and terrorizing the minor child of the group, the defendant fled the immediate vicinity and eventually fled Los Angeles county in an apparent attempt to evade immediate prosecution. [¶] . . . [T]he defendant's use of a firearm . . . for prejudicial reasons indicates that he continues to exemplify criminal tendencies, he is out of control, he is definitely a threat to the community constituents, society at large and his immediate long-term removal from the community is warranted to eliminate the furtherance of racial violence and to protect the community members. [¶] At this point, state prison is the only appropriate recommendation. . . ."

[12]In imposing sentence, the trial judge stated:

"Mr. Lashley, you have committed an egregious offense against society, for which you must be punished and punished severely. [¶] And it's my intention here today to impose the maximum sentence imposed and provided by law, a sentence that in my judgment you so justly and richly deserve based on the facts of this case."