Filed 5/3/23  P. v. Faniel CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>DEVION RAYNARD FANIEL,<br><br>        Defendant and Appellant. | D080803<br><br><br><br>(Super. Ct. No. FSB19002836) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Michael A. Smith, Judge.  Affirmed with directions.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

Devion Raynard Faniel appeals from the final judgment entered after a jury found him guilty of attempted murder, assault with a firearm, and possession of a firearm by a felon stemming from his involvement in a 2019

shooting. Faniel contends that reversal is warranted for three reasons: (1) the trial court prejudicially erred by allowing law enforcement witnesses to narrate surveillance video, identify Faniel as the shooter, and opine that Faniel was guilty; (2) there was insufficient evidence to prove the specific intent to kill required for Faniel's conviction for attempted murder; and (3) there was insufficient evidence to prove that Faniel did not act in defense of himself or another as required for his conviction for assault with a firearm. We find no prejudicial error and therefore affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Evidence at Trial*

In July 2019, Darnell B. and his cousin, Marquiz G., were "hanging out" in the parking lot of a liquor store when multiple cars pulled up to them. Several people, including Reginald Jenkins, got out of the cars, and a woman walked over and confronted Darnell. According to Marquiz, the woman was Jenkins's daughter, who had accused Darnell of hitting her. One person in Jenkins's group had a pipe or bat, another had a golf club, and Jenkins had a kitchen knife with a 12-inch blade.

Darnell attempted to walk away from the impending fight but was chased by several members of Jenkins's group. Someone in the group punched Darnell, and after he fell to the ground, Jenkins stabbed him multiple times. Marquiz attempted to help Darnell and pull him away, but Jenkins stabbed Marquiz too.

After Marquiz was stabbed, he retrieved a gun he had previously hidden in a trash can just outside of the liquor store. Marquiz started shooting, and he testified that his "only focus" at that point was Jenkins because Jenkins was the person who had stabbed him. He did not point his gun or shoot at Faniel. When interviewed by law enforcement officers a few

2

weeks after the incident, Marquiz estimated that he had fired approximately 10 rounds at Jenkins.

Marquiz was shooting at Jenkins when another person from Jenkins's group—later identified by Marquiz and law enforcement officers as Faniel— fired at least one shot at Marquiz. The shot did not hit him. After Faniel fired his gun at Marquiz, he took off running across the parking lot towards the street.

While Marquiz had been retrieving his gun from the trash can, Darnell was able to get away from Jenkins and to the other side of the liquor store parking lot. Darnell crouched behind an SUV, but the vehicle began backing up, so he went around to the front of the SUV to avoid being hit. He then ran down the sidewalk next to the parking lot because he heard gun shots. As he was running away, he was shot in the upper leg/buttocks. The shot left him with a wound to his buttocks and a bullet fragment lodged in his pelvic bone.

During the investigation of the incident that followed, law enforcement officers obtained and reviewed three videos taken from surveillance cameras at the liquor store that captured the incident. Officers also used a license plate reader to track one of the vehicles that had been in the liquor store parking lot the night of the shooting. This led officers to an apartment complex, where they found both Jenkins and Faniel. One of the officers recognized Faniel from the surveillance videos and noticed that he was wearing what appeared to be the same shorts that the shooter was wearing in the video. Officers also found Faniel's identification inside of one of the vehicles that had been at the parking lot during the shooting.

Law enforcement officers interviewed Marquiz and questioned him about the incident. One officer placed Faniel's photograph in a lineup, and Marquiz identified Faniel as the shooter. Marquiz identified Jenkins (also

known as "Reddy") as the person who stabbed Darnell and Marquiz. Marquiz testified at trial that he did not want to identify anyone in the courtroom, stating that he did not want to make any additional statements beyond what he had already provided. He confirmed, however, that the person in the lineup photograph he had previously initialed (Faniel) was the same person who shot at him and Darnell. Darnell declined to identify anyone involved, telling officers that he did not want to prosecute.

At trial, the prosecution played the surveillance videos for the jury and asked several witnesses, including some law enforcement officers, to describe what they saw in the videos. Officer Manuel Valenzuela testified as to what he believed was depicted in the various video clips as they were played for the jury, pointing out muzzle flashes from the guns being shot and describing what he believed was happening from each angle and who was shooting. Officer Andrew Saibene testified that in his review of the surveillance videos after seeing Faniel in person, he recognized Faniel in the videos. He also identified Faniel in a series of screenshots taken from the surveillance videos. Sergeant Jonathan Plummer testified that he recognized Faniel as the person shooting at Darnell in the surveillance videos. Defense counsel repeatedly objected to the identification testimony and some of the opinion testimony, but the trial court overruled most objections.

Faniel did not testify or present an affirmative case. In closing, defense counsel argued that the prosecution had failed to prove beyond a reasonable doubt that Faniel was the shooter or that he acted with specific intent to kill and with premeditation and deliberation.

4

B. *Conviction and Post-Trial Motions*

The jury found Faniel guilty of attempted murder (Pen. Code,[1] §§ 664 and 187, subd. (a)), assault with a firearm (§ 245, subd. (a)(2)), and possession of a firearm by a felon (§ 29800, subd. (a)(1)). The jury also found true the personal infliction of great bodily injury and firearm enhancements as to the attempted murder and assault convictions, including that Faniel personally inflicted great bodily injury (§ 12022.7, subd. (a)), personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), personally used a firearm (§§ 12022.53, subd. (b), 1203.06, subd. (a)(1), 12022.5, subd (a)), and used or possessed a firearm for offensive or defensive use and intended to cause great bodily injury (§§ 1170.12, subd. (c)(2)(C)(iii), 667, subd. (e)(2)(C)(iii)). It further found true the allegation that the attempted murder was willful, premeditated, and deliberate.

Faniel admitted that he was previously convicted of first-degree residential burglary and kidnapping, which the information had alleged qualified as "strikes" (§§ 1170.12, subds. (a)–(d), 667, subds. (b)–(i)) as well as prior serious felonies (§ 667, subd. (a)(1)).

The trial court denied Faniel's request to strike his two prior convictions for first-degree residential burglary and kidnapping under the three strikes law, but it granted his request that those convictions be stricken for purposes of the five-year prior serious felony enhancement under section 667, subdivision (a)(1). The court also struck the jury's finding that the attempted murder was willful, deliberate, and premeditated based on the court's conclusion that the evidence was insufficient to support the finding. It

---

[1]     Undesignated statutory references are to the Penal Code.

further granted Faniel's motion to strike the firearm enhancements as to each count pursuant to section 1385.

C. *Sentencing*

The court sentenced Faniel to a total indeterminate term of 25 years to life plus three years. It imposed 25 years to life for the attempted murder conviction, plus an additional three years for the great bodily injury enhancement. The court also imposed 25 years to life (plus an additional three years) for the assault conviction, but it stayed that term under section 654. Finally, the court imposed a concurrent four-year term for the possession of a firearm by a felon conviction.

DISCUSSION

I

Faniel contends that the trial court erred by allowing several law enforcement officers to testify as to their opinions of what was depicted in the surveillance videos. Specifically, he argues that (1) the court should not have permitted the officers to identify Faniel as the shooter in the videos; (2) the court should not have allowed the officers to narrate the videos to the jury; and (3) Sergeant Plummer improperly testified as to Faniel's guilt and the crimes committed. Faniel argues that the admission of the officers' identification testimony, the officers' narration of the surveillance videos, and Sergeant Plummer's statement of the crimes committed was prejudicial and thus warrants reversal.

A. *Identification by Law Enforcement Witnesses*

Faniel first contends that the law enforcement officers' testimony identifying him as the shooter in the surveillance videos was erroneously admitted because it is improper opinion testimony. The People respond that a person's identity is a proper subject of nonexpert opinion at trial and the

6

lay opinion testimony identifying Faniel in the videos here was properly admitted.  The People are correct.

A lay witness may offer opinion testimony if it is "rationally based on the perception of the witness" and helpful to a clear understanding of the witness's testimony.  (Evid. Code, § 800.)  We review a trial court's decision to admit or exclude evidence, including lay opinion identification testimony, for abuse of discretion.  (*People v. Thompson* (2010) 49 Cal.4th 79, 128; *People v. Leon* (2015) 61 Cal.4th 569, 600 (*Leon*).)

In *Leon*, the Supreme Court considered an appeal by a defendant who had objected to a detective's identification of him at trial as the person in a surveillance video of a robbery, arguing that it was inadmissible lay opinion.  (*Leon*, *supra*, 61 Cal.4th at p. 600.)  The detective "testified that he was 'very' familiar with the defendant's appearance" based on his arrest of the defendant and the fact that he saw him nearly 10 times after the arrest, spending approximately two hours with him total.  (*Ibid*.)  The detective also opined that the jacket the defendant was wearing when he was arrested appeared to be the same jacket worn by the suspect in the surveillance videos.  (*Id*. at pp. 600–601.)

The Supreme Court held that a person's identity is the proper subject of lay witness opinion testimony and found that the detective's identification testimony was properly admitted in that instance.  (*Leon*, *supra*, 61 Cal.4th at p. 601.)  The Court noted that "Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs."  (*Ibid*.)  Although the defendant in *Leon* attempted to distinguish those decisions on the ground that the detective had no contact with him before the crimes at issue, the Court found that to be "a distinction without a difference," because it was undisputed that the detective "was

7

familiar with defendant's appearance around the time of the crimes." (*Ibid.*) The Court found that any "[q]uestions about the extent of [the detective's] familiarity with defendant's appearance went to the weight, not the admissibility, of his testimony." (*Ibid.*)

We find *Leon* to be directly on point here. Just as the detective in *Leon* identified the defendant in a surveillance video based on his interactions with the defendant after but "around the time of the crimes," Officer Saibene and Sergeant Plummer identified Faniel as the suspect in the surveillance videos based on their interactions with him around the time of the shooting. (*Leon*, *supra*, 61 Cal.4th at p. 601.)

Officer Saibene testified that he encountered Faniel a few weeks after the shooting during his investigation into one of the vehicles present at the crime scene. Officer Saibene was at an apartment complex when he saw Jenkins and Faniel, recognizing Faniel because "he matched one of the suspects in the video surveillance." The officer testified that Faniel "was one of the subjects shooting" in the videos. At the apartment complex, Officer Saibene walked by and came within two feet of Faniel and looked at his facial features. Officer Saibene opined that Faniel "matched the description" of the suspect in the surveillance videos and that he "was also wearing the same basketball shorts [when arrested] that he was wearing during the shooting." He also identified Faniel in a series of screenshots from the surveillance videos, noting again that he "matched the description" and describing Faniel's physical features that stood out to him as similar to those in the surveillance footage, including that Faniel was "dark-skin complected," had "kind of scruffy" facial hair, and had a "small afro-ish" hairstyle.

Sergeant Plummer testified that he recognized Faniel in the surveillance videos based on his interview of Faniel the day he was arrested.

8

The two sat "within one to two feet" of each other during the interview, which lasted "between 30 and 40 minutes" and allowed Sergeant Plummer "to observe [Faniel] from head to toe the entire time." Sergeant Plummer also testified that the shorts Faniel was wearing during his interview "matched the same shorts that the defendant was using or wearing at the time of the shooting." Based on watching the videos and observing Faniel's facial features and clothing, Sergeant Plummer was "100 percent sure" that Faniel was the shooter depicted in the videos.

Faniel attempts to distinguish his case from *Leon* by arguing that the officers who identified him at trial did not see him in person and determine he was one of the shooters from the surveillance videos until around three weeks after the shooting, while the identifying officer in *Leon* arrested the defendant only one day after one of the crimes that was caught on video. (See *Leon, supra*, 61 Cal.4th at pp. 600–601.) But the Supreme Court has concluded that testimony identifying defendants in surveillance footage or photographs is admissible so long as the witness is "familiar with defendant's appearance *around* the time of the crimes." (*Id.* at p. 601, italics added.) We find that, under these circumstances, the officers' interactions with Faniel three weeks after the crime satisfy this requirement.

Moreover, the Court held in *Leon* that the extent of a person's "familiarity with the defendant's appearance [goes] to the weight, not the admissibility, of his testimony," explaining that it was the jury's duty to weigh the credibility of the officers' testimony. (*Leon, supra*, 61 Cal.4th at p. 601.) The trial court here properly instructed the jurors on lay witness opinion testimony, telling them that they were "not required to accept those opinions as correct" and could "give those opinions whatever weight you think is appropriate." And here, as in *Leon*, the surveillance video was played for

9

the jurors, who could evaluate for themselves whether Faniel was the shooter. (*Leon*, at p. 601.)

Faniel also argues that whereas the defendant in *Leon* had changed his appearance after his arrest, the officers here testified that Faniel's appearance at trial was similar to when they first observed him, and their identification of Faniel was therefore not helpful to the jury. We again disagree. First, Faniel's characterization of the testimony is not quite accurate. Officer Saibene testified that Faniel's appearance was slightly different than it had been around the time of the crime, stating that Faniel was "a little bit more clean-cut" and his hair and facial hair were "not the same." Sergeant Plummer also testified that Faniel looked a little different at trial, noting that his hair was neater and he looked "dapper." Second, even assuming Faniel's appearance had not changed much (or at all) since the time the officers first observed him, we do not find that to be dispositive. The trial court here reasonably concluded that the officers' testimony identifying Faniel was based on their "relevant personal knowledge and aided the jury." (*Leon*, *supra*, 61 Cal.4th at p. 601.) We therefore find no abuse of discretion.

B. *Narration of Surveillance Videos by Law Enforcement Witnesses*

Faniel next contends that the trial court erred in allowing Officer Valenzuela, Officer Saibene, and Sergeant Plummer to describe the contents of the surveillance videos and still shots, arguing that their narration constituted improper opinion testimony.[2] The People argue that much of the

---

2    Anticipating a forfeiture argument, Faniel argues at the outset that, to the extent his defense counsel failed to clearly articulate objections to the officers' narration and opinion testimony at trial, he received ineffective assistance of counsel. The People respond that defense counsel did in fact fail to object to improper lay opinion testimony and to Sergeant Plummer's testimony as to the crimes committed. We do not decide whether Faniel preserved his claims of error but instead "elect to address the objections on

testimony Faniel challenges does not constitute lay opinion testimony, and that even if it did, it was largely helpful to the jury and thus admissible. We agree with the People.

The court in *People v. Son* recently considered a similar challenge to a detective's testimony about what she observed from watching surveillance video of a stabbing. (*Son, supra,* 56 Cal.App.5th at p. 696.) The detective testified that she had viewed the video more than 50 times, explaining that when she first watched it, she did not notice a shiny object she referred to as "a stabbing instrument" fly out of defendant's right hand, but that she was able to perceive those events after repeated viewings. (*Id.* at p. 695.) Rejecting the defendant's claim that the detective's commentary was improper lay opinion, the court stated: "[W]e fail to see any opinions expressed in [the detective's] testimony. She essentially just testified to what she saw. . . . If she had witnessed the actual murder and given the exact same testimony, we certainly would not characterize it as opinion testimony. It would be percipient testimony. Why does it become an opinion just because she saw it in a video?" (*Id.* at p. 697.) The court then assumed for the sake of argument that the testimony was opinion, but it still found the testimony admissible because it was rationally based on the detective's perception and helpful to the jury, as it enabled the jury "to speed up the process of teasing out obscure details in the video." (*Ibid.*)

---

their merits rather than address the ineffective assistance of counsel claim." (*People v. Son* (2020) 56 Cal.App.5th 689, 696, fn. 1 (*Son*); see also *People v. Gonzalez* (2021) 12 Cal.5th 367, 411 [assuming without deciding that defendant preserved his claim and rejecting the argument on its merits].) In any event, we would reach the same result analyzing Faniel's claim of ineffective assistance of counsel in violation of his Sixth Amendment rights under *Strickland v. Washington* (1984) 466 U.S. 668.

The same is true here. The three officers whose testimony Faniel challenges as improper lay opinion merely testified to what they saw in the surveillance videos. Even assuming for the sake of argument that the officers' testimony was opinion, as the *Son* court did, we find that it was both rationally based on the officers' perception and helpful to the jury.

Officer Valenzuela, for example, identified for the jury what he believed to be muzzle flashes shown in the videos as the two shooters fired their guns, and he explained the concept of a muzzle flash, which the jury may not have been familiar with. He pointed out that there was a second muzzle flash coming from the gun fired by the person later identified as Faniel, demonstrating that Faniel fired two shots rather than one. This was helpful because the second muzzle flash was difficult to discern from the video, and the jury may not have been able to perceive it or appreciate its import without the officer's testimony. (*People v. Phillips* (2022) 75 Cal.App.5th 643, 685 [finding that the sergeant's testimony narrating surveillance video aided both the jury and the court by pointing out where and when bloodstains appeared on the footage].)

We also find it relevant that the video clips shown to the jury consisted of three different surveillance videos taken from different angles, as well as modified versions of two of the videos, which may have been confusing for the jury. Officer Valenzuela described the crime scene from each angle, explaining that the person seen shooting from a particular angle in one video was the same person seen running towards the street and shooting in another video. Similarly, Officer Saibene and Sergeant Plummer testified as to what they believed was happening in various still shots taken from the surveillance video, describing muzzle flashes and movements of Faniel and others present at the crime scene. Like the testimony in *Son*, this

12

commentary likely aided the jury in "discerning the exact events that transpired," which was otherwise "difficult because 'there[ was] so much going on [and] . . . so much movement.'" (*Son, supra,* 56 Cal.App.5th at p. 695.)

Faniel argues that the officers were in no better position than the jury to evaluate the video evidence, because the video was of good quality. Even assuming that were true, lay opinion testimony can be helpful to a jury even where the jury might be able to make the same determinations without the aid of the testimony. "[T]he standard is not whether the testimony was essential," but whether it is "helpful." (*Son, supra,* 56 Cal.App.5th at p. 697.) Here, the officers' testimony aided the jury in understanding the video evidence, and the trial court therefore did not err in allowing the testimony.

C. *Sergeant Plummer's Testimony as to Faniel's Guilt*

Faniel contends that Sergeant Plummer's testimony opining that the surveillance videos showed that an assault with a deadly weapon and an attempted murder had occurred was an improper opinion on the law and thus inadmissible.[3] The People do not dispute this but argue that the testimony did not prejudice Faniel. We again agree with the People.

Faniel is correct that witnesses are not permitted to express an opinion as to a defendant's guilt or whether a crime has even been committed. (*People v. Torres* (1995) 33 Cal.App.4th 37, 46–48 (*Torres*) [finding it was

---

3    Faniel also briefly argues that Officer Saibene's statements identifying Faniel as the shooter amounted to improper opinion testimony as to his guilt. We are not persuaded. Officer Saibene did not make any statement as to whether Faniel was guilty of the crimes charged. Rather, he merely opined that Faniel was one of the shooters in the videos, which does not compel the conclusion that he was guilty of attempted murder or the other charges. Officer Saibene did not testify, for example, that Faniel had the intent to kill or that he did not act in self-defense.

improper for officer to express the opinion that the alleged crimes committed were robberies].)  Here, Sergeant Plummer testified that, after watching the surveillance videos, he "was able to determine that obviously an assault with a deadly weapon and an attempted murder had occurred."  No one disputes that his testimony was improper.  The question now is whether the admission of the testimony prejudiced Faniel such that it warrants reversal of his convictions.

Improper admission of lay opinion evidence is generally a state law error subject to the test set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), which only requires reversal where "it is reasonably probable the defendant would have obtained a more favorable verdict if the improper evidence had not been admitted."  (*People v. Shorts* (2017) 9 Cal.App.5th 350, 362.)  Like the defendant in *Shorts*, Faniel argues that his claim of error should instead be analyzed under the federal harmless beyond a reasonable doubt standard.  (See *Chapman v. California* (1967) 386 U.S. 18, 24.)  Faniel argues that the *Chapman* standard applies here because the admission of Sergeant Plummer's statement, along with the identification and narration testimony, violated his constitutional rights by usurping the jury's role as factfinder.  But opinion testimony regarding whether a crime was committed is inadmissible not because the testimony goes to the ultimate issue of fact to be decided by the jury, but rather because such an opinion is "of no assistance to the trier of fact."  (*Torres, supra*, 33 Cal.App.4th at p. 47; *id*. at pp. 48–49 [finding that although defense counsel's failure to object to opinion testimony as to whether a robbery was committed constituted ineffective assistance, the error was not prejudicial because it was not reasonably probable the result of the proceeding would have been different but for the error].)  It is thus the *Watson* standard that applies to Faniel's claim of error.  (*People v. Coffman*

14

*and Marlow* (2004) 34 Cal.4th 1, 76 [erroneous admission of opinion testimony on defendant's guilt is state-law error subject to *Watson* standard of prejudice].)

We conclude it is not reasonably probable Faniel would have obtained a more favorable result but for Sergeant Plummer's statement. Faniel argues that because the evidence against him consisted mainly of video surveillance, along with Marquiz's identification of him as the shooter, it is reasonably probable that without the admission of the law enforcement officers' testimony, at least one juror would have had a reasonable doubt that Faniel was the shooter, acted with intent to kill, or did not act in defense of himself or another. But our conclusion that the officers' identification and narration testimony was properly admitted significantly undercuts his claim of prejudice. The only improper testimony at issue is Sergeant Plummer's single comment about the crimes committed, which was a passing line in a trial that consisted of testimony from 12 witnesses over the course of eight days. The remainder of Sergeant Plummer's testimony was admissible as helpful to the jury, and his improper comment was never mentioned again, including in the prosecutor's closing statement. Moreover, as we explain in more detail below, the properly admitted evidence supports the jury's finding that Faniel committed assault with a firearm and attempted murder. We therefore conclude that improper admission of Sergeant Plummer's statement does not warrant reversal.

## II

Faniel next contends that his convictions for attempted murder and assault with a firearm must be reversed because there was insufficient evidence to support them. Specifically, Faniel argues that (1) the evidence presented in support of the attempted murder charge was insufficient to

15

prove he had the specific intent to kill, and (2) there was insufficient evidence to prove that he did not act in defense of himself or another. According to Faniel, the jury's verdicts on these charges therefore violated his due process rights under the federal Constitution.

A. *Standard of Review*

When a defendant challenges the sufficiency of the evidence to support a conviction, we review the whole record in the light most favorable to the judgment to determine whether any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*); *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.) We presume the existence of every fact the jury could reasonably have deduced from the evidence in support of the judgment and " 'accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*Zamudio*, at p. 357.)

The record must, however, contain substantial evidence to support the verdict. (*Zamudio*, *supra*, 43 Cal.4th at p. 357.) To be substantial, evidence must be " 'reasonable in nature, credible, and of solid value.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) We may reverse for insufficient evidence only where "upon no hypothesis whatever is there sufficient substantial evidence to support the jury's verdict." (*Zamudio*, at p. 357.)

B. *Sufficiency of the Evidence of Faniel's Intent to Kill*

A conviction for attempted murder requires a specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. (§ 21a; *People v. Lee* (2003) 31 Cal.4th 613, 623.) Faniel does not dispute that the prosecution presented sufficient evidence of a direct but ineffectual act toward accomplishing the killing, but he contends that the evidence was insufficient to prove he had the intent to kill. We disagree.

16

Substantial evidence supports the jury's conclusion that Faniel intended to kill Darnell. Because "[t]here is rarely direct evidence of a defendant's intent. . . [, it] must usually be derived from all the circumstances of the attempt, including the defendant's actions." (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690 (*Chinchilla*).) Here, defendant's actions were caught on video. The surveillance videos showed Faniel running across the parking lot while firing two shots at Darnell as Darnell attempted to run away. It appears from the videos that Faniel was no more than one or two car lengths away from Darnell when he shot him. This act "of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target,' " is sufficient on its own to support an inference of intent to kill. (*Chinchilla*, at p. 690; see also *People v. Smith* (2005) 37 Cal.4th 733, 742 (*Smith*) [a "shooter's purposeful 'use of a lethal weapon with lethal force' against the victim, if otherwise legally unexcused, will itself give rise to an inference of intent to kill"].) The lethal nature of the weapon Faniel used and the short distance from which he fired it support an inference that he intended to kill.

Faniel argues that the record shows that when he shot Darnell, he acted in the moment, in response to Marquiz's shooting, and without intent to kill. He claims this is the only reasonable interpretation of the evidence based on the following facts: (1) Faniel only fired one shot at Darnell; (2) the shot hit Darnell's buttocks—"not a location of the body that reflects an intent to kill," according to Faniel; (3) Faniel ran away from the scene after he shot Darnell rather than approaching him to shoot him again and at closer range after he fell down; (4) Marquiz started shooting first, and Faniel was running away from Marquiz at the time he shot Darnell; and (5) it is possible Faniel believed Darnell had just retrieved a weapon and fired a shot in Darnell's

17

direction to "ward off harm to himself" as he fled the scene. We are not convinced.

The first three points Faniel offers in favor of reversal are either based on facts that are inaccurate or arguments that have been soundly rejected by other courts. First, the record establishes that he fired two shots, not one, in Darnell's direction. As Officer Valenzuela testified at trial, the surveillance videos show two muzzle flashes coming from Faniel's gun as he points it at Darnell. Firing multiple shots at a victim supports a reasonable inference of an intent to kill. (*Chinchilla, supra*, 52 Cal.App.4th at p. 690; see also *Smith, supra*, 37 Cal.4th at p. 742.) Second, even if Faniel had fired only a single shot before fleeing the scene, "[t]he fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945 (*Lashley*).)

Faniel's argument that his failure to shoot Darnell again and at closer range demonstrates lack of intent to kill also rests on the assumption that Faniel *knew* he had failed to inflict a fatal wound. Nothing in the record supports that conclusion. Nor does the fact that Faniel's shot hit Darnell in the buttocks rather than a more vulnerable place on the body necessarily establish a lack of intent to kill. Darnell may have only "escaped death because of [Faniel]'s poor marksmanship." (*Lashley, supra*, 1 Cal.App.4th at p. 945.) It was reasonable for the jury to conclude that it was Faniel's poor marksmanship and Darnell's efforts to flee that prevented more serious injury or death. Faniel's argument to the contrary "rests on the untenable theory that an unsuccessful killing constitutes conclusive evidence of lack of intent," and we therefore reject it. (*Ibid.*)

18

Faniel's remaining contentions relate to his self-defense theory. Essentially, he argues that because he did not shoot his gun until after Marquiz started shooting, and because the scene was "chaotic" and may have led Faniel to believe Darnell had a gun himself, the only reasonable inference is that Faniel merely fired in Darnell's direction to "ward off harm to himself" as he fled from Marquiz. Although such an inference may be possible, it is certainly not the *only* reasonable interpretation. And where "the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*); see also *Lashley*, *supra*, 1 Cal.App.4th at p. 946 ["While reasonable minds may differ on the resolution of that issue, our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."].)

Here, the circumstances reasonably justify the jury's finding. Darnell was unarmed and running away from Faniel when Faniel shot him. Faniel's speculation that Darnell could have retrieved a gun, and Faniel therefore may have reasonably believed Darnell to be a threat to his safety, is unsupported by the record. No evidence was presented showing that Darnell had a weapon at any point during the incident or threatened Faniel or anyone in his group. Rather, testimony and surveillance videos demonstrated that it was Faniel, Jenkins, and their group who arrived at the liquor store armed with multiple deadly weapons, instigated the fight, and attacked Darnell. It was reasonable based on these circumstances and Faniel's actions for the jury to reject his claim that he was merely seeking to avoid harm to himself when he shot Darnell.

Viewing the evidence in the light most favorable to the judgment, we conclude there was sufficient evidence from which the jury could find that Faniel harbored the intent necessary for an attempted murder conviction.

C. *Sufficiency of the Evidence That Faniel Did Not Act in Self-Defense or Defense of Another*

Faniel also contends that his conviction for assault with a firearm must be reversed because there was insufficient evidence to prove he did not act in defense of himself or Jenkins when he shot Darnell.[4]  Faniel argues that no reasonable juror could have found that the prosecution proved beyond a reasonable doubt that Faniel did not act in lawful defense of Jenkins and "arguably had a reasonable belief he was acting in self-defense thereafter." We disagree; much of the evidence supporting an inference that Faniel intended to kill Darnell also demonstrates that Faniel did not act in lawful self-defense or defense of Jenkins when he shot Darnell.

To justify self-defense for an assault charge under section 245, " 'the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him.' " (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064, italics in original.)  "The ultimate judgment of reasonableness is solely for the jury." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1088.)  The trial court properly instructed the jury as to this defense, stating that the jury could not find Faniel guilty of assault with a firearm if it found he had acted in self-defense or defense of another and explaining that this standard was met if Faniel (1) reasonably believed that he or someone else was in

_____

[4]     Faniel does not raise this issue as to the attempted murder count, even though the trial court instructed the jury that he was not guilty of attempted murder if he acted in self-defense or defense of another.  Even if Faniel had raised this issue as to the attempted murder, however, we would reject it because our reasoning here applies equally to both counts.

imminent danger of suffering bodily injury, (2) reasonably believed that the immediate use of force was necessary to defend against that danger, and (3) used no more force than was reasonably necessary to defend against that danger. The court further explained that the prosecution had the burden of proving beyond a reasonable doubt that Faniel did not act in lawful self-defense.

In arguing that the prosecution failed to prove he did not act in justifiable self-defense, Faniel again claims that he "would not have necessarily perceived" as he fled the scene that the man standing near Darnell was not in fact Marquiz or that Darnell himself had no weapon. Faniel also relies on the fact that he did not fire his gun until after Marquiz began shooting at Jenkins.

The evidence presented at trial contradicts this argument and provides substantial evidence that (a) Faniel did not honestly believe he or Jenkins was in imminent danger, and/or (b) any such belief was not reasonable. First, our review of the surveillance videos leads us to conclude that the jury could reasonably find that Faniel knew the man standing near Darnell was not Marquiz. The video shows Faniel firing at Marquiz and then almost immediately fleeing the scene, running away from Marquiz and towards Darnell as he shoots him. Second, Faniel shot Darnell as he was running away from him. The shot hit Darnell in the buttocks, further demonstrating that his back was turned to Faniel when he was shot. There is no evidence that Darnell displayed, retrieved, or used a weapon at any point during the incident, even after he was punched, stabbed, and shot by Faniel and his group. The jury could reasonably conclude that Darnell was not, in fact, armed, and that even if Faniel believed he needed to protect himself or Jenkins from Darnell, that belief was unreasonable.

21

The jury may have also found that Faniel was not entitled to use self-defense or act in defense of Jenkins because it was the two of them and their group that first assaulted Darnell and Marquiz. By the time Marquiz began shooting, Faniel's group had already punched Darnell and stabbed both Darnell and Marquiz. As the trial court properly instructed the jury, someone who initiates a fight may only use self-defense if they try to stop the fighting and indicate to their opponent that they want to stop fighting. (CALCRIM No. 3471.) Faniel did not do so.

Although a different jury might have found that the evidence raised a reasonable doubt as to whether Faniel was justified in shooting Darnell, that possibility does not warrant reversal. (*Albillar*, *supra*, 51 Cal.4th at p. 60.) Our role is "not to second guess the reasoning or wisdom of the factfinder." (*Lashley*, *supra*, 1 Cal.App.4th at p. 946.) The prosecution here presented the jury with ample evidence that Faniel did not act in self-defense when he shot Darnell. Even defense counsel did not argue self-defense to the jury; he explicitly stated in his closing argument: "Now, there were some instructions that were given on self-defense and defense of others that may or may not apply. I'm not going to really argue that." Instead, Faniel's defense focused on the theory that he was not the shooter. For all these reasons, we conclude that sufficient evidence supports the jury's determination that Faniel did not act in self-defense or defense of another.

## III

The People contend that the abstract of judgment should be amended to correct clerical error as to the sentence imposed for count three. Although the trial court sentenced Faniel to a concurrent four-year term for count three, the abstract of judgment incorrectly reflects a concurrent three-year term. Faniel does not respond to this argument in his reply brief. We agree

22

with the People that this clerical error should be corrected. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

## DISPOSITION

The judgment is affirmed. The trial court is directed to prepare a corrected abstract of judgment reflecting that Faniel was sentenced to a concurrent four-year term for count three. The court shall forward the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


BUCHANAN, Acting P.J.

WE CONCUR:



KELETY, J.



CASTILLO, J.